In the Matter of the MARRIAGE OF Donna Maria KNIGHTON and Havon Paul Knighton.

No. 07–85–0337–CV.

Court of Appeals of Texas, Amarillo.

Jan. 8, 1987.

Akin, Gump, Strauss, Hauer & Feld, Robert E. Goodfriend and Jo Bess Jackson, Dallas, for appellant.

Kolander & Hamilton, R.C. Hamilton, Amarillo, for appellee.

Before REYNOLDS, C.J., and COUNTISS and BOYD, JJ.

BOYD, Justice.

This is a case involving child custody. In twenty-seven points, appellant Donna Maria Knighton attacks the judgment in which, consistent with the jury verdict, her former husband, appellee Havon Paul Knighton, was appointed managing conservator of their two minor sons. We reverse the judgment and remand the cause for new hearing.

The marriage between appellant and appellee was dissolved by decree dated September 16, 1982. In that decree, again in pursuance of a jury verdict, appellee was named as managing conservator of the children involved. The portion of that judgment awarding custody of the minor children to appellee was challenged by appellant. Because of improper jury argument, that portion of the decree was reversed by this Court and remanded for retrial of all issues pertinent to conservatorship, possession, and support of the children. *Matter of the Marriage of Knighton*, 685 S.W.2d 719, 722 (Tex.App.—Amarillo 1984, no writ). The instant appeal, of course, arises out of that retrial.

Appellant's twenty-seven points can be grouped into six basic attacks upon the judgment. In points one through eight, she argues that the evidence concerning, and comments on, appellant's religious beliefs deprived her of a fair and impartial trial and were calculated to, and did, cause the rendition of an improper judgment. In points nine, ten, and eleven, appellant says that the introduction of the evidence concerning her religious beliefs and practices constituted fundamental error because it violated her "constitutional right to the free exercise of her religion and to the separation of Church and State." In points twelve through fourteen, she avers that fundamental error was committed by the receipt of evidence that members of her church petitioned the Amarillo Independent School Board to recognize certain religious holidays for children of church members, and by the admission of statements from church sermons and her religious thoughts as expressed in her diary. In points fifteen

and sixteen, appellant attacks the failure of the trial court to instruct the jury that it could not consider the religious beliefs of either parent in determining the best interest of the children. This failure, she says, was fundamental error. In points seventeen through twenty-one, she says appellee's jury argument contained misstatements of facts not supported by the evidence as well as misstatements of law and was inflammatory and prejudicial. The effect of these things, she argues, was to deprive her of her constitutional right to freedom of religion and separation of church and state, and they were "reasonably calculated to cause and probably did cause the rendition of an improper judgment." In points twenty-two through twenty-seven, she contends that the trial court reversibly erred in the admission in this case of testimony concerning the prior trial and jury decision.

In response, appellee says that not only was the testimony as to appellant's religious beliefs, practices, and conduct properly admitted, but that appellant failed to make proper objection to that testimony. Furthermore, he says, by withdrawing a motion for mistrial after the trial judge indicated he would grant that motion, appellant waived her right to complain of error as to the admission of, and comment on, evidence as to appellant's religious beliefs and practices. He also contends that, although the cross-examination of appellant from her diary was proper, no proper objection to that cross-examination was made. He further asserts that not only was his jury argument proper, but that appellant failed to make any proper objection to that argument. He also asserts no error was committed when appellee "blurted" out the result of the prior trial because the trial judge immediately instructed the jury to disregard the statement. Moreover, he says, that error, if any, was harmless because appellant introduced evidence as to the outcome of the first trial.

Again, as we did in the prior trial, we note that Mrs. Knighton is a member of the Worldwide Church of God, a denomination

headquartered in Pasadena, California, which was formerly led by Herbert W. Armstrong. The record establishes beyond cavil that Mrs. Knighton's religious beliefs, her private religious thoughts from her personal diary that came into Mr. Knighton's hands, and the teachings of her church were the focal and pivotal points of the trial.

The record establishes that the Worldwide Church of God is a Christian church that advocates a fairly strict set of tenets. Among those tenets are beliefs that diverge, to some extent, from mainstream Christian theology. Members of the church celebrate a Friday evening to Saturday evening Sabbath, in contrast to the more usual Sunday Sabbath. They do not celebrate holidays such as Easter or Christmas, nor do they celebrate individual birthdays. Neither does the church believe in building its own church buildings but rents and uses other buildings for its worship services. The church also advocates a three-tier tithing policy. The first tithe is forwarded to the church headquarters. The second is for the tithing member's use during one of the church's holy days attended by members during the year. The third tithe is for the benefit of the widows and needy in the church.

■ In support of her contention that the trial court reversibly erred in admitting evidence as to her religious practices and those of her church, Mrs. Knighton attempts to invoke the "law of the case" doctrine. That doctrine is defined as "that principle under which the initial determination of questions of law will be held to govern the case throughout its subsequent stages." *Trevino v. Turcotte*, 564 S.W.2d 682, 685 (Tex.1978). The doctrine applies only if it appears on a second appeal that the facts are substantially the same as those involved in the first trial. Even then, the application of the doctrine is not completely rigid and inflexible but is applied by the court within its discretion. *Kropp v. Prather*, 526 S.W.2d 283, 285–86 (Tex.Civ. App.—Tyler 1975, writ ref'd n.r.e.). It is Mrs. Knighton's position that our holding

in the prior case, Matter of the *Marriage of Knighton*, 685 S.W.2d at 722, constituted a finding that her religious beliefs were not harmful and, hence, could not be reexamined. Not so. The basis of our holding was the axiomatic rule that the State cannot, directly or indirectly, prefer the religious views of one parent over the other in deciding the best interest of the child. Under the factual state of the record at that time, the challenged jury argument was a reversible violation of that principle. Our holding did not determine as a matter of law that proper evidence about Mrs. Knighton's religious practices and their detrimental effects on the children could not have been introduced, if such evidence had been available.

In a proceeding such as the instant case, Texas law requires that "the best interest of the child ... always be the primary consideration of the court in determining questions of managing conservatorship, possession, and support of and access to the child." Tex.Fam. Code Ann. § 14.07(a) (Vernon 1986). Article I, section 6 of the Texas Constitution, in pertinent part, provides:

> No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship.

The First Amendment to the United States Constitution, in its pertinent part, provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.

That clause is applicable to the states through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 302, 60 S.Ct. 900, 902, 84 L.Ed. 1213 (1940).

■ These constitutional provisions mandate a zealous protection of an individual's untrammeled right to religious belief so long as the teachings and practice of that religious belief are neither illegal or immoral. Accordingly, the courts of this state would have no more power to, directly or indirectly, attempt to effectuate by decree

a conformance to, or condemnation of, certain religious teachings or practices, than would the Legislature or the Congress have the power to establish a state religion by law. As relevant here, that means that one's religious beliefs, teachings, and practices, per se, are not grounds for depriving a parent of his or her children unless the teachings and practice of such beliefs are illegal or immoral. *Frantzen v. Frantzen,* 349 S.W.2d 765, 767–68 (Tex.Civ.App.—San Antonio 1961, no writ). Thus, it is beyond the power of a court, in awarding the custody of a child or children to prefer the religious views or teachings of either parent, even though the beliefs and practices of one parent might be more "normal" or more in accord with majority religious views or practices. *Salvaggio v. Barnett,* 248 S.W.2d 244, 247 (Tex.Civ.App.—Galveston 1952, writ ref'd n.r.e.), *cert. denied,* 344 U.S. 879, 73 S.Ct. 176, 97 L.Ed. 681 (1952). Therefore, as this Court earlier stated in the first appeal of this case, it is a fundamental principle that the State cannot prefer the religious views of one parent over the other in deciding the best interest of a child. *Matter of Marriage of Knighton,* 685 S.W.2d at 722. This principle, we believe, must also be subject to the qualification that if the religious doctrines and practices of an applicant for custody do in fact seriously threaten the physical or mental well-being of the child, or would lead the custodian to neglect such a child, this might be a basis for favoring a different custodian.

The extent of the focus upon Mrs. Knighton's religious beliefs is demonstrated by the fact that of the thirty pages in the statement of facts covering the direct examination of Mr. Knighton, seventeen of those pages reflect testimony concerning Mrs. Knighton's religious beliefs and practices. Mr. Knighton was extensively interrogated about Mrs. Knighton's expressed belief that "[s]he will obey the laws of her church above the laws of the State and Federal laws." He testified that Mrs. Knighton did not believe in the celebration of birthdays because "[t]hey're evil ... [b]ecause the Bible says so, the only time

they're mentioned in the Bible, and she calls it bloody time and she does not celebrate them." He also testified that she told him "Christmases are also evil" and that "Donna considers Easter as pagan, again, what she has told me, and does not want to celebrate it." He said that Donna told the children that they were going to be persecuted because of their religion and that Paul, one of the children, would not live to be thirteen because "[t]he world would, as we know it, would end. By then the second coming would happen." He was extensively interrogated about the appearance of members of Mrs. Knighton's church, including her, before the Amarillo School Board to attempt "to get the number of excused absences increased, I believe around 14 or 15 days." The announced reason, he said, was "[b]ecause God wanted them to be absent so that she could to [sic] to her—what was called a feast of the tabernacles in October." This request, incidently, was initially refused by the school board but was later granted by federal court mandate.

The direct examination continued with the following dialogue:

Q. Now, while you were married, did your former wife subject these two boys to that religion?

A. Yes, sir.

Q. In what way and how—how many times, or what ways?

A. No telling how many times, continuously. She would teach them her beliefs. She would take them to church with her on Saturday until they started getting old enough and I could see that that was a detrimental affect [sic] on them, and I would keep them. And when I tried to keep them home, she would get upset about it.

Q. Now, you mentioned Saturday.

A. Yes, sir.

Q. What is the significance of Saturday?

A. Saturday is their Sabbath, the day they are required to go to church and do no menial labor.

Q. From when to when?

A. Friday sundown to Saturday sundown.

Q. Now, after the divorce, has your former wife, on occasion, still subjected these children to that religion?

A. Yes, sir, on the weekends she has visitation.

Appellee was also interrogated about appellant's position on heaven and hell which was, according to him, "[n]obody's going to heaven" and "[h]ell, to Donna, means the grave." The interrogation continued:

Q. All right. What is Donna's attitude—or Mrs. Knighton's attitude about education?

A. Education is bad.

Q. And why?

A. I really can't say.

Q. Well, why does she say its bad?

A. Well, people who are educated usually do not believe in her religion, they're not—their eyes are not open to the truth as presented by the Worldwide Church of God, and since they have the only corner on God's truth, then she wants to keep them away from education, which is also Satanic, if you will.

Q. Does your former wife have any members of her family that are officials or ministers in this church?

A. Yes, sir.

Q. How many of them?

A. Four, some uncles and cousins, or they were at that time.

Q. When you married Mrs. Knighton, were you aware of these beliefs?

A. No, sir.

Q. When did they first begin to surface?

A. January, 1978.

When queried as to how his wife had demonstrated instability during the marriage, Mr. Knighton replied, "She started going back to the church, that I noticed, in January of 1978." He went on to say, as additional grounds, that Mrs. Knighton had disappeared with one or more of the children in November of 1979 for two weeks and in November of 1981 for 33 days. When queried as to indications of his wife's instability subsequent to the divorce, he replied that "[s]he has not changed any of her beliefs. In the last three years she has moved six times. During that time, about half the time she has had unlisted phone numbers." He was further interrogated about his suggestion as to changes in visitation if the children were awarded to him. His reply was that he would like to have the children every Easter and Christmas: "I believe that they would—they would be home during those periods. And she does not believe in either one. Christmas was very bad. She told them that God hates Santa Claus and anyone who celebrates Easter, and it upsets them."

Of the twenty-three page cross-examination of Mrs. Knighton, eighteen are devoted to her religious beliefs. She was interrogated extensively about her communication of those religious beliefs to the children. Since the Worldwide Church of God meets in rented buildings, she was questioned at length about asserted statements to the children about "steeples that stick up in the sky from other churches" and whether she had told the children that "God was going to knock these steeples down." She was also queried extensively about her belief that "there are 6,000 years that mankind has been given to rule himself" to be followed by a thousand year period when Christ will rule the world, "[c]leaning it up" and as to whether "[d]uring this thousand years, Mr. Armstrong and his church, they're going to be in control." Mrs. Knighton was further cross-examined as to whether she had told the children that they would be persecuted because of their religion and she was examined at length, about notes she had made as to the way the world looked at her religion, in the following manner:

Q. Did you ever write down, "The world looks at us the same way Nazis—"N-a-z-i-s. I assume you mean Nazi party—

A. I guess.

Q. "—looked at Jews. They said they were subhuman but were afraid of their power. They are afraid of our obe-

dience and our truth." Did you write that down?

A. I don't recall writing that.

Q. Right here it is. Is that your writing or not?

A. Yes, sir.

Q. And did you mean that for Hitler?

A. No. That's Himler [sic].

Q. Did you mean this to be in Germany?

A. Yes, sir.

Q. And you meant that to be Nazi and you spelled it N-a-s-i-s. And you said, "The only way we can be destroyed is if we cooperate with Satan."

[Objection, voir dire examination, and court's ruling overruling the objection omitted.]

Q. Now, did you write this on the page? "Society is structured and we don't fit?"

A. Yeah, I probably did.

Q. Who is we?

A. People that share in my belief.

Q. That would include your children?

A. Yes, my children if they were raised in my belief.

Q. So you believe and you are telling us that your children don't fit in society, is that correct?

A. Sort of, I guess.

Q. You have told your children that they don't fit in society.

A. I never told my children that.

Q. But you believe it.

A. I believe one day, if they decide to go in my church, when old enough to make a decision, they won't fit in society.

Q. You also wrote on the same page, "By living God's way and bucking the system, because it's wrong, we become free when we obey God."

A. Bucking Satan's system.

Q. What do you mean?

A. That means if there is ever a law that is in conflict with God's law, I will go with God's law.

Q. You're not going to accept anything except what God tells you?

A. No.

Q. No? Where is it in error?

A. If he and the State agree, I'll go along with it. If there is something that keeps me from observing my religion, I'll have to observe my religion. I believe that.

She was further interrogated about her intent to raise the children in her religion, and the number of members of her family who are "preachers in this church or whatever their titles are."

In cross-examination of Mrs. Knighton's witness Phil Hambrick, he was interrogated extensively about the church's policy as to tithing and whether "Mr. Armstrong, or Reverend Armstrong, or however you address him, does he require you all to tithe?" The tenor of the examination as to the church members' religious beliefs is shown by the following excerpts:

Q. Now, do y'all celebrate childrens— or anybody's birthday?

A. No, sir, we don't.

Q. Do y'all consider that evil, sin or harmful or anything wrong with it?

A. No, just simply that—we just don't celebrate birthdays.

Q. What do you call people that do celebrate birthdays?

A. I don't call them anything.

Q. Do you call them Satans?

A. Absolutely not.

Q. You don't know that? Who do you call Satans, the church?

A. I'm not sure I understand the question.

Q. You repeatedly in your literature, the word Satan is mentioned repeatedly; you agree with that, don't you?

MR. HALE: Your Honor, I'm going—

BY MR. HAMILTON:

Q. Do you agree with that or not?

A. Well, I don't know what you mean by repeatedly. I mean—

Q. I want you to tell this jury what your Satan is, now.

A. The Bible talks about a devil.

Q. No, what's yours in your religion, not what the Bible says, what you say Satan is in your religion.

A. Well, in the first place, you're characterizing this as my religion, and we simply take our religion out of the Bible.

Q. You don't—you don't—you mean this is not your religion?

A. No, I'm just saying I believe what the Bible says.

Q. Well, are you able to tell us what Satan is, now, or not?

A. I believe Satan is the devil.

Q. And—well, what I'm really getting at, don't you say that Satan is anybody that's not in your church?

A. No, sir, that's not true at all.

\* \* \* \* \* \*

Q. Don't you tell people that man's ruled, but when the six thousand years are up, that y'all are going to rule? Is that part of your religion or not?

A. We believe that we rule with Christ after that time.

Q. And you're going to rule all of us for a thousand years and that thousand years is supposed to start right away, isn't it?

\* \* \* \* \* \*

Q. Do you believe you're a persecuted race?

A. A persecuted race?

Q. Yes. You're here to be persecuted?

\* \* \* \* \* \*

Q. Isn't that what you tell your kids at Christmas why they can't do what the other kids do, because you are persecuted?

\* \* \* \* \* \*

Q. All right. Now, have you appeared before these Amarillo Independent School Board meetings where your religion has requested the school to allow your children, that is the members of your church, for y'all to take them out of school on 14 days during the school where they're not required to make that

work up, take those tests, or to do any of their homework during those 14 days. Have you actually participated in that, yourself?

\* \* \* \* \* \*

Upon recross-examination:

Q. The celebration of Easter, y'all, or you feel about it just like you do Christmas and birthdays, don't you.

A. We don't celebrate Easter.

Q. Same deal; that's what the question was. That's true, isn't it.

A. I'm sorry, I didn't understand you.

Q. Well, you won't permit your children or yourself to have any celebration or do anything in Easter, just like you treat Christmases and just like you treat birthdays; is that true?

The continuous focus upon Mrs. Knighton's religious beliefs and tenets culminated in Mr. Knighton's jury arguments. In his opening argument, counsel argued:

Getting back to the boys. Another thing I want to point to you in the testimony, I think that to me is the most telling point in the entire case is when I asked Mrs. Knighton about if she had a conversation with these two boys about the steeples on other churches, she denied it at first, then when it got a little closer, she said they had talked about it, and then I wanted to know what she and the boys talked about and it finally comes out that she admits she did talk about it with them, the very thing I first talked about and that she had denied. And, that is that God was going to strike down all these other steeples because they were sticking up in God's face and he was going to strike them all down and bring them down. She said they talked about that the whole weekend. Imagine what that would do to a 6 and 7 year old child to be told things like that. Repeatedly. She says, "Oh, they are the ones that brought it up." Can you believe that, from your own common sense that 6 and 7 year old boys would take it on themselves to tell their mother that God was going to strike those people down be-

cause they were sticking up in this face? No. No rational minds can accept that. That is the mother telling these boys what is going to happen to them. What God is going to do, and telling them the various things and beliefs that she has. Think of that.

In his closing argument, counsel stated: Now, Father Tash, of course, was incorrectly quoted. He stated, very specifically, that it would be all right to have a church in its beginning phase in another facility. It would be all right to use a public place. Sure. Any church that is going to function, ought to be able to function in another building during the construction of its own place. As I see it, this is a chance for a normal life for these children as opposed to an abnormal during their childhood. No Christmas. Can't celebrate Christmas. Can you imagine in your own childhood how it would have been if you were told you could not have anything to do with Christmas and all of the other kids in your area, they had Christmas?

No Easter. No birthdays. When all the other kids do. Are you going to make these kids have an abnormal life, or are you going to give them a noraml [sic] place in life?

It is uncontradicted in this record that none of Mrs. Knighton's religious beliefs and practices are illegal or immoral. We must, therefore, examine the record for evidence bearing upon the crucial question as to the effect those beliefs and practices might have upon the physical and mental well-being of the children, or as to whether those beliefs would lead the custodian to neglect such a child. Mr. Knighton testified that the children "didn't like it that they could not have a birthday in their own house and that their mother wouldn't participate with them." He also said that the children "just wonder why they never got to do this stuff [Christmas and Easter] that other kids got to." The children, upon their return to him after visitation, were "hyper" because of "things [religious beliefs] that Donna has said to them that upset them, and I'll have to explain that to

them." When specifically queried as to Mrs. Knighton's failure as a mother, he responded that she would not work outside the home, would not keep the house clean, even though she was home all day and, the "boys would wet in the bed and she would not change the sheets" and "[t]hey were dirty at times."

On cross-examination, when asked if it was correct to say that the main reason he thought the jury should give custody of the children to him was because of his disagreement with his wife's religious views, he replied "No, sir. Religion has nothing to do with this." However, when asked why so much time had been spent on Mrs. Knighton's religious views, he responded, "Well, because Donna holds certain beliefs, and I personally don't care where the beliefs come from, and these beliefs, in my opinion, are detrimental to the proper upbringing and physical and emotional welfare of the children." When asked to state "one belief that you think that your wife has that is injurious to your children," Mr. Knighton's reply was:

Donna's belief that her church comes before the welfare of her children. And by "welfare," I mean before medical welfare, before food, before clothing, before shelter. That shows to me that that particular belief means Donna will not take care of the children if there is a conflict between the church and the children.

When questioned as to his belief that his wife's religious beliefs would adversely affect the children's education, his conclusion was that because of the number of religious holidays that the church celebrated, "if they stayed out that many times, their academics would suffer."

 Summarized, appellee's position must be that, because of the deviation from the norm of Mrs. Knighton's religious beliefs, the best interest of the children requires the vesting of their custody in him. Other than his conclusory statements, there is no supporting direct evidence, expert or otherwise, that Mrs. Knighton's

beliefs and practices are such as to cause serious bodily or mental injury to the children or that those beliefs had or would cause her to neglect the children. Without that supporting evidence, the evidence produced led to a constitutionally impermissible trial of the orthodoxy of Mrs. Knighton's religious beliefs. As the Supreme Court said in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943):

> [F]reedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order.
>
> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.

*See also* the expression of this Court in *Reynolds v. Rayborn*, 116 S.W.2d 836, 838–39 (Tex.Civ.App.—Amarillo 1938, no writ). As the Court noted in *Salvaggio v. Barnett*, 248 S.W.2d at 247:

> Under the American principle of separation of Church and State, the secular power is so shackled and restrained by our fundamental law that it is beyond the power of a court, in awarding the custody of the child, to prefer, as tending to promote the interest of the child or *surround it with a more normal atmosphere*, the religious views or teachings of either parent. [Emphasis added.]

The constitutional error in the admission of evidence in this cause is one which was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case. Moreover, our Supreme Court, in *Pirtle v. Gregory*, 629 S.W.2d 919 (Tex.1982), pointed out that an error is fundamental in those instances where "the public interest is directly and adversely affected as that interest is declared in the statutes or the Constitution of Texas." *Id.* at 920. The error, therefore, being of constitutional dimension, is fundamental.

Having made that determination, it becomes necessary for us to determine appellee's contention that Mrs. Knighton had, by withdrawing a motion for mistrial, waived any error. In connection with that withdrawal, the record shows the following which occurred during the cross-examination of Mrs. Knighton's witness Phil Hambrick, to-wit:

Q. Does your church frown on education?

A. Our church belongs strongly in education.

Q. Has your—does your church say that education is harmful to people?

A. No.

Q. Have you ever talked with Donna and asked her whether she believes education was harmful or not?

A. I've never asked that question, no.

Q. Has she ever stated it to you whether you asked it of her or not?

A. No. I've heard Donna say, though, that education is very good.

Q. We have it in writing here where she says its very harmful.

MR. HALE: Your Honor, I'm going to object. He's—once more, he's testifying about what he has in writing. It's evidence outside the jury, and I object.

THE COURT: Sustain the objection. The jury will disregard any comments that Mr. Hamilton—

MR. HALE: I move for a mistrial, Your Honor, because of the prejudicial— the cumulative prejudicial effect of Counsel's behavior cannot be overcome by the Court's instructions.

THE COURT: Why don't the jury step outside for a moment, please. Why don't you step down for a minute, Mr. Hambrick, I have got something—

(Thereupon, the jury left the courtroom, and the following was had.)

THE COURT: Mr. Hamilton, if, in fact, there does not come into the record

what you have just alleged to, I will grant the mistrial, and if you don't have it, I would just as soon do it now than wait until it happens.

MR. HAMILTON: It may not be in writing, but its in her prior testimony where she said its harmful.

\* \* \* \* \* \*

MR. HAMILTON: The reference that I was making appears on Page 69 in the Statement of Facts where the Respondent testified, on Line 10. "ANSWER: There is harm in education, but it is necessary, some education."

Other than that, I have nothing in writing. That of course, is the written Statement of Facts there, as she testified.

THE COURT: Go back and find that question, Paula. The testimony—

MR. HALE: Your Honor, to save the Court's time, I want to withdraw my motion for a mistrial.

THE COURT: That's your decision because I'm about to grant it.

MR. HALE: I want to withdraw it, Your Honor.

Prior to this occurrence, Mrs. Knighton had made two previous motions for mistrial. The first such motion occurred during the direct examination of Mr. Knighton and was based upon testimony of Mr. Knighton, admitted over objection, that Mrs. Knighton believed "[t]he church comes before her children, before her family, before everything." The second such motion occurred during the redirect examination of Mr. Knighton's witness Patricia Sowers as follows:

Q. Mr. Hale asked you something about it being funny that a man would start going to the Catholic Church after he got a divorce. Now, on the same line, would it seem normal to you, if you were married to a man who was obsessed with some religion that few people accepted, many people detested, and a lot of people though it was extremely harmful to those—

MR. HALE: Your Honor—excuse me, I object. Counsel's characterization of what people think of a religion is improper and prejudicial and denies my client the effective right of a fair trial, and I move for a mistrial.

THE COURT: I'll deny your motion for a mistrial. Mr. Hamilton, rephrase the question about someone's testimony because there has been no evidence that any of [the] things you said are before this Court.

It is, of course, Mr. Knighton's position that, by the withdrawal of her last mistrial motion after the court indicated it would grant that motion, Mrs. Knighton waived any error in the overruling of prior objections which might have been directed at improper injection of religion as well as any error in the overruling of her prior motions for mistrial. On the other hand, predictably, Mrs. Knighton contends that the withdrawal of the last motion waived only that particular asserted error, *i.e.*, counsel's erroneous statement about what he had in writing, and did not waive any prior error. Mr. Knighton also asserts that because of the failure to object to his jury argument, any error in that respect was not properly preserved for our review.

■ The reason for the requirement that a litigant preserve a trial predicate for complaint on appeal is that one should not be permitted to waive, consent to, or neglect to complain about an error at trial and then surprise an opponent on appeal raising his complaint anew. *Pirtle v. Gregory*, 629 S.W.2d at 920. Moreover, such a course of conduct is unfair to the trial judge in that that judge is not given the opportunity to correct any such error at trial with the consequent saving in time and expense to all concerned. In the interest of Mrs. Knighton alone was involved in this case, Mr. Knighton's waiver argument would be compelling, since, if the court's offer of a mistrial had been accepted, it would have given Mrs. Knighton the relief from earlier error, which at the time she thought egregious enough to require mistrial. However, in a case involving the custody of a child or children, the interests of the State are involved since it is its duty as a sover-

eign to look after, and protect, the welfare of children located within its boundaries. *Wicks v. Cox*, 146 Tex. 489, 208 S.W.2d 876, 878 (1948); *Woodard v. Texas Dept. of Human Resources*, 573 S.W.2d 596, 597 (Tex.Civ.App.—Amarillo 1978, writ ref'd n.r.e.); *Hollis v. Hollis*, 508 S.W.2d 179, 182 (Tex.Civ.App.—Amarillo 1974, no writ). No action of, or failure to take action by, Mrs. Knighton could waive that State interest.

In an action such as this, the statutorily mandated test for the determination of custody is the "best interest of the child," Tex.Fam.Code Ann. § 14.07(a) (Vernon 1986), and the State's interest in the proceedings requires that that test be followed. The proceedings here under review strayed from that standard and, instead, became a trial of Mrs. Knighton's religious beliefs without accompanying evidential proof that those beliefs were illegal, immoral, or caused serious mental or bodily injury to the children. That being the case, the trial became a constitutionally impermissible invasion of Mrs. Knighton's right of freedom to worship, requiring us to sustain Mrs. Knighton's points nine, ten, and eleven. Sustention of these points pretermits the necessity for discussion of the remainder of Mrs. Knighton's points of error.

■ In her supplemental brief, and in a motion before this Court, Mrs. Knighton asks that we suspend, pursuant to Texas Family Code Annotated § 11.11(f) (Vernon 1986), the order of the trial court appointing Mr. Knighton temporary managing conservator of the minor children. Since this is an action which might require the taking of testimony and determination of factual questions, matters within the peculiar province of the trial court, we must refuse that application. Mrs. Knighton further asks that we issue extensive specific instructions concerning the mode of retrial of this cause. This application we also refuse since we are confident that any retrial will be properly accomplished without the constitutional infirmities that have required the reversal of both this trial and the proceeding one.

The judgment is reversed and the cause remanded for new trial.

COUNTISS, J., concurs.

REYNOLDS, C.J., dissents.

COUNTISS, Justice, concurring.

This Court is unanimous in its belief that legitimate religious practices of no harm to a child cannot be used to deprive a parent of that child. We differ, however, on the procedural viability of that issue in this appeal. Well into the trial, and after several unsuccessful objections and motions, Mrs. Knighton moved for, and was offered, a mistrial. She then withdrew her motion and declined the offer. The procedural question is whether an offer by the trial court to grant a mistrial erases trial errors that preceded the offer. Justice Boyd concludes that her declination is unimportant, because she cannot waive the State's interest in protecting its children. Chief Justice Reynolds concludes that her declination estops her from complaining about trial court errors that preceded the proffered mistrial. Each cites authority that is applicable by analogy, but the precise question is not, in my view, settled in Texas.

As a policy matter, I would follow a middle ground. I do not think this is the kind of case where the State's interest is so overriding that error cannot be waived nor do I believe the trial court is protected from all antecedent error when it offers a mistrial. I agree that, if the trial court offers a mistrial and the offer is declined, the parties should not thereafter be allowed to complain about the event that led to the offer. However, other errors on other events that preceded the offer should remain viable. See *Eubanks v. Winn*, 420 S.W.2d 698, 702 (Tex.1967). Otherwise, at the end of a hard and complex case, the trial court could cleanse itself and place counsel in an intolerable tactical position by offering a mistrial.

In this case, the mistrial was offered because Mr. Knighton's counsel was testi-

fying instead of asking questions. However, the error we think reversible is the improper use of Mrs. Knighton's religious beliefs. That error occurred well before the mistrial offer. Therefore, I would hold that Mrs. Knighton is not estopped to assert that error by declining a mistrial on other grounds, and, having reached that conclusion, I agree with Justice Boyd that the case must be reversed and remanded for a new trial free of religious harassment.

REYNOLDS, Chief Justice, dissenting.

Although I agree that the trial court erred in admitting testimony of, and in permitting comment upon, Mrs. Knighton's religious beliefs and practices which were neither illegal or immoral nor shown to affect the physical or mental well-being of the children, I conclude from this record that Mrs. Knighton waived the complaints now made on appeal and, by her acquiescence, is estopped to urge the errors asserted. Consequently, I respectfully dissent to the reversal and remand.

The first fourteen of Mrs. Knighton's twenty-seven points of error are predicated upon the admission of evidence regarding her religious beliefs and practices. One does not read far in this record to reach the theme of the promotion of Mr. Knighton's managing conservatorship of the children because of Mrs. Knighton's religious beliefs and practices. Since an appeal to religious prejudice cannot be a factor in deciding the best interest of the children, *Matter of Marriage of Knighton*, 685 S.W.2d 719, 722 (Tex.App.—Amarillo 1984, no writ), the trial court erred in overruling Mrs. Knighton's first two motions for mistrial voiced on that ground. However, later in the trial, when Mr. Knighton's counsel, Mr. Hamilton, responded to a witness' answer by saying, in effect, it was in writing that Mrs. Knighton says education is very harmful, there was then recorded the following:

MR. HALE [Mrs. Knighton's trial counsel]: Your Honor, I'm going to object. He's—once more, he's testifying

about what he has in writing. It's evidence outside the jury, and I object.

THE COURT: Sustain the objection. The jury will disregard any comments that Mr. Hamilton—

MR. HALE: I move for a mistrial, Your Honor, because of the prejudicial—the cumulative prejudicial effect of Counsel's behavior cannot be overcome by the Court's instructions.

THE COURT: Why don't the jury step outside for a moment, please. Why don't you step down for a minute, Mr. Hambrick, I have got something—

(Thereupon, the jury left the courtroom, and the following was had).

THE COURT: Mr. Hamilton, if, in fact, there does not come into the record what you have just alleged to, I will grant the mistrial, and if you don't have it, I would just as soon do it now than wait until it happens.

MR. HAMILTON: It may not be in writing, but it's in her prior testimony where she said it's harmful.

THE COURT: Well, then, are you going to apologize to the jury and tell them that you said something that's not true, or am I going to—and I'll give you about five minutes to think about that. If y'all will excuse me, I'm—

MR. HAMILTON: No, no, no. I don't need but 30 seconds, Your Honor.

THE COURT: I'm going to give you five minutes.

(Thereupon a recess was had, after which the following proceedings were had).

MR. HAMILTON: The reference that I was making appears on Page 69 in the Statement of Facts where the Respondent testified, on Line 10. "ANSWER: There is harm in education, but it is necessary; some education."

Other than that, I have nothing in writing. That, of course, is the written State of Facts there, as she testified.

THE COURT: Go back and find that question, Paula. The testimony—

MR. HALE: Your Honor, to save the Court's time, I want to withdraw my motion for a mistrial.

THE COURT: That's your decision, because I'm about to grant it.

MR. HALE: I want to withdraw it, Your Honor.

THE COURT: You understand—let me go ahead and put that on the record, Mr. Hale, is that I—if I have remembered Mr. Hamilton's question correctly, I do not think that can be cured, and I will grant your motion for mistrial, if you choose to make that motion.

MR. HALE: Your Honor, can I have two seconds?

THE COURT: Yes.

(Thereupon, a short break was had.

MR. HALE: Your Honor, we're going to withdraw our motion.

THE COURT: All right. Do I understand, Mr. Hale, that you are declining the Court's offer to grant a mistrial on this issue?

MR. HALE: Yes, sir, at this time we are, Your Honor.

THE COURT: Do you understand I will not grant one on this issue later?

MR. HALE: I understand that.

THE COURT: I'm not precluding you from raising the issue later if Mr. Hamilton persists in testifying.

MR. HALE: Your Honor, I've visited with my client and we think that the case is in such posture that we have decided to go on with it and pursue it.

THE COURT: That's your decision. I certainly believe that Mr. Hamilton's question was not a question, it was a bit of testimony and appeared not to be true.

MR. HALE: I would ask, Your Honor, that the Court instruct the jury to disregard his last statement. That's the only cure request I have.

THE COURT: All right. That's fine. (Thereupon, the jury was returned to the courtroom, and the following proceedings were had before the Court and jury).

THE COURT: Ladies and gentlemen, Mr. Hale's objection to the last comment by Mr. Hamilton is going to be sustained. The record does not reflect and there is no evidence of any writings by—I'm sorry, I forgot everybody's name—Mrs. Knighton, purported. You will therefore disregard this comment. Any further instructions, Mr. Hale?

MR. HALE: No, sir.

Thereafter, Mrs. Knighton did not object to the testimony adduced, to the jury argument made, or to the jury charge given.

It is elemental that the proffered mistrial would have afforded Mrs. Knighton the relief from the errors she asserts in her first fourteen points of error, and would have granted her all of the relief she now seeks on appeal. But Mrs. Knighton affirmatively declined a mistrial; instead, she specifically opted to pursue the case as it was postured with the instruction she requested and received. As a consequence, Mrs. Knighton is in no position to complain of the failure of the trial court to declare a mistrial before the court offered to do so, *Keels v. First Nat. Bank of Groveton*, 71 S.W.2d 372, 377 (Tex.Civ.App.—Galveston 1934, no writ); or to complain of the admission of evidence upon which the case was postured when she urged the court to continue the trial. *Dickson v. J. Weingarten, Inc.*, 498 S.W.2d 388, 391 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ). Orderly procedure does not permit a party to waive error and receive everything requested and then complain of the court doing precisely what it was requested to do. *Reynolds v. McMan Oil & Gas Co.*, 11 S.W.2d 778, 785 (Tex.Comm'n App. 1928, holdings approved). In that situation, which is the situation here, the party is estopped to complain. *Northeast Texas Motor Lines v. Hodges*, 138 Tex. 380, 158 S.W.2d 487, 488 (1942).

The estoppel is not negated, in my view, by the majority's theory that injection of religion into the cause was fundamental error that could not be waived by Mrs. Knighton because of the State's interest in the welfare of children within its boundaries. The action was not one which transcended the rights of the parents to estab-

**288**

lish the State's criteria for the best interest of the children; instead, it was a divorce action involving the rights of the parents to the managing conservatorship of the children. Thus, the admission of the religious evidence can hardly be classified as an error which directly and adversely affects the interest of the public generally. Moreover, to adopt the majority's holding is to embrace its logical extension that in an appeal from a conservatorship determination, the aggrieved party is entitled to ignore all procedural requirements of the predicate for and the assignment of error, and have the best interest of a child reviewed as a matter of unassigned fundamental error founded on the State's interest. That has not been, and should not now be, the law.

For the foregoing reasons, I would overrule the first fourteen points of error. For the same reasons, I would overrule Mrs. Knighton's points of error twenty-two through twenty-seven by which she ascribes error to the admission of evidence concerning the prior trial and its results.

Points fifteen and sixteen are Mrs. Knighton's contention that the court fundamentally erred in failing to instruct the jury that it could not consider religious beliefs or affiliations of either parent in determining the best interest of the children. The absence of the instruction does not come within the definition of fundamental error, and Mrs. Knighton waived any error in the omission by failing to request the submission of the instruction. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 538 n. 4 (Tex.1981). These points should be overruled.

Mrs. Knighton uses her points seventeen through twenty-one to complain that Mr. Knighton's jury argument was erroneous in that it was inflammatory and prejudicial, contained misstatements of fact and law, and violated her constitutional right to freedom of religion. No objection was made to the argument. The perceived errors in the argument are not, in my opinion, so prejudicial or inflammatory as to be incurable by an instruction to disregard. Then, absent an objection, any error was

waived. *Otis Elevator Company v. Wood,* 436 S.W.2d 324, 333 (Tex.1968). Therefore, these points of error should be overruled.

Under this analysis of the appeal, all of Mrs. Knighton's points of error should be overruled, and the judgment of the trial court should be affirmed. It is in accordance therewith that I respectfully dissent to the reversal and remand.