In the Matter of the MARRIAGE OF Marianne RUTLAND and Lawrence J. Rutland and in the Interest of Nicholas J. Rutland and Brian Andrew Rutland, Minor Children.

No. 05–86–00510–CV.

Court of Appeals of Texas, Dallas.

April 1, 1987.

Rehearing Denied May 4, 1987.

924

Michael Sloan, McKinney, for appellant.

R. Dean Irwin, Houston, for appellee.

Before WHITHAM, BAKER and LaGARDE, JJ.

WHITHAM, Justice.

In this child custody case, the appellant-mother, Marianne Rutland Chaisson, appeals from the trial court's order granting the appellee-father's, Lawrence J. Rutland, motion to modify in a suit affecting the parent-child relationship. The order removed Marianne as managing conservator of the parties' two sons, ages five and six, and appointed Lawrence as managing conservator. Marianne contends that testimony regarding her religious beliefs and practices as a member of Jehovah's Witnesses violated her rights under the First Amendment of the United States Constitution and article I, section six of the Texas Constitution and that such evidence was incompetent. She further contends that the evidence is legally and factually insufficient to support the jury's finding that retention of her as managing conservator would be injurious to the children. She further contends that the evidence is legally and factually insufficient to support the jury's finding that appointment of Lawrence would be a positive improvement for the children. She also contends that the trial court erred in denying her motion for new trial and motion for judgment notwithstanding the verdict. We conclude that, because Marianne failed to object to the evidence regarding her religious beliefs and practices, she waived any error regarding admission of that evidence. We further conclude that the evidence is legally and factually sufficient to support the complained-of jury findings and that the trial court correctly denied Marianne's motion for new trial and motion for judgment notwithstanding the verdict. Accordingly, we affirm.

In her first point of error, Marianne contends that the trial court's judgment should be reversed because the testimony regarding her religious practices was incompetent evidence and allowing such testimony was an abridgement of her rights under the First Amendment to the United States Constitution and Article I, section six of the Texas Constitution. In her brief, Marianne insists that the following questions and her answers deprived her of her rights under both constitutions:

Q. Now, during Christmas—you don't celebrate Christmas, do you?

A. No, sir, I don't.

Q. Why not?

 \* \* \* \* \* \*

A. Christmas comes from Saturnalia which is pagan.

Q. So we can shorten it, then, and say it is pagan ritual?

A. If you would like to.

 \* \* \* \* \* \*

Q. You don't celebrate birthdays, either, do you?

A. No.

Q. Why not?

A. Because of the ones that have been recorded in the Bible, the birthday of pharaoh and the birthday of Herod, the one who had all the babies killed—Herod had John the Baptist beheaded on his birthday. Pharaoh had his baker hung on his birthday, and being that the only two birthday celebrations are recorded in the Bible and since those birthdays were enjoyed by only pagans, to me and to Jehovah's Witnesses it is evidence that Jehovah God does not approve of birthday celebrations.

Q. So I guess what we could say now is that if Nicholas were to celebrate his birthday with his father, his natural father, Larry, it would be involved in a pegan [sic] ritual? Is that a fair statement?

A. Its—I guess. I'd say that's fair.

\*　　\*　　\*　　\*　　\*　　\*

Q. Are you concerned about how these two children might react when you take something that their daddy has given them and throw it away? Does that concern you ma'am?

A. If I were to throw something away they would have been given a reason. They know I don't allow military toys in the house.

Q. Why don't you?

A. Because it is against scriptural principles.

Q. How about that flag? What if Larry gave them that flag, do you have that in the house, that American flag right behind you?

A. I couldn't say. He's never sent them one.

Q. Well let's hypothesize. Could they have that?

A. I'd have to give it some serious thought.

Q. I want you to tell this Jury what you have told to 5 and 6 year old children of yours what would happen if they went to live with their daddy.

A. That if they went to live with their daddy, he could provide very abundantly in a material way, but as far as spiritual things, there wouldn't be that much. However, if they were to stay with us, and I'm speaking of by choice, if they were to stay with us, then we cannot provide as much as Mr. Rutland can, however, we can provide abundantly in a spiritual way and they stand a good chance of passing through Armageddon and living forever in a paradise.

\*　　\*　　\*　　\*　　\*　　\*

Q. You're telling your natural children, this man's children, that if they go live with him they are going to go to hell?

A. No sir.

Q. Well, what did you just tell this jury what you're telling them then?

A. I said if they go by choice and want to live with a man who does not serve Jehovah, then.

Q. They are going to hell?

A. Then Jehovah can hold them accountable.

Q. That's not what you said Mrs. Chaisson.

A. That's what I mean, Mr. Irwin.

\*　　\*　　\*　　\*　　\*　　\*

A. I can recall [putting hot pepper juice on the children's tongues] doing Nicholas one time because he lied and Brian maybe twice, maybe three times. I don't recall.

Q. Now, listen to me very carefully. Have you ever told the children—let's just break it up. Have you ever told the children that you'll put hot peppers on their mouth if they prayed to daddy's God?

A. No, sir. I cannot make my children serve Jehovah.

\*　　\*　　\*　　\*　　\*　　\*

Q. Are the children allowed to participate in any extra-curricular activities?

A. Not at this time.

Q. Why not?

A. We devote time to more important things.

Q. I think that's where we left off a moment ago. What is more important?

A. Certainly preparing for the meetings we have.

Q. What meetings?

A. The meetings at the Kingdom Hall of Jehovah's Witnesses. I'm speaking of spiritual things.

Q. How often do they have to prepare for that?

A. We have three meetings, three different times a week, excuse me.

\*　　\*　　\*　　\*　　\*　　\*

Q. Well, would you let them play in the band?

A. Well, perhaps. If I felt it was not taking away from their school work or spiritual activities.

Q. Well, if they played in the band and it came time to play "God Bless America", would you let them do it?

A. They would be silent.

Q. I'm sorry. They would be what?

A. Silent. I have no objections to bands.

Q. What do you mean they would be silent?

A. They would not participate in the song.

Q. Why not?

A. It is a patriotic song.

Q. What's wrong with that?

A. We are not patriotic.

\* \* \* \* \* \*

Q. What is the most important thing in your life, Mrs. Chaisson?

A. I would say my service to Jehovah.

Q. Even if that is detrimental to your children?

A. It is not detrimental.

\* \* \* \* \* \*

Q. Well, they know, when the two children receive presents from their father and you're teaching them that if they worship in the way that their father does and if they celebrate Christmas and birthdays and if they're patriotic and all those things that you don't agree with religiously, isn't that teaching the children through their emotions that any relationship they have with their father is a demon-type relationship, and therefore, repulsive?

\* \* \* \* \* \*

Q. Have you ever discussed with your children—well, you said yesterday that you had, discussed with your children the saying of prayers when they're with their daddy. You recall us talking about that yesterday, don't you?

A. I don't recall. I'm not sure.

Q. Well, have you discussed with your children the saying of prayers when they're with their father?

A. Yes.

Q. Tell the Jury what you said about telling them that?

A. Well they—their father does not pray to Jehovah, so pray to—

Q. Who is Jehovah?

\* \* \* \* \* \*

A. Jehovah is God.

Q. Who are you telling your children when they visit with their daddy who they're praying to, then?

A. The Trinity, that's who they pray to.

Q. And that's—is that repulsive?

A. To pray to a false God is repulsive, yes.

Q. So, you teach your children that if they go visit their daddy and pray that something they're doing is repulsive; is that right?

A. Not exactly.

Q. Well, what exactly is right?

A. I teach them to pray to Jehovah is what is pleasing to Jehovah. To pray to another God is not pleasing to Jehovah, that they can still pray to Jehovah no matter where they are.

Q. Well, don't you think, Mrs. Chaisson, that when you tell your children these kind of things when they come back from being with their daddy, that that's causing them some emotional turmoil within themselves?

A. I don't believe so.

Q. You don't think so?

A. No, sir.

Q. Because you don't think so, Mrs. Chaisson, you're going to continue to teach them just as you have been since your marriage to Mr. Chaisson, aren't you?

\* \* \* \* \* \*

A. I don't intend to change my teachings about Jehovah.

Q. And how it affects your children and their relationship with their natural fa-

ther emotionally is of no concern to you, is it?

A. My children's emotional welfare is of concern to me.

\* \* \* \* \* \*

A. Well, Mr. Irwin, you're not bringing out the fact that a parent has the responsibility to teach their children the truth, and considering myself Christian, I take seriously that responsibility, so we teach them what the Bible says, that there is only one true God and to worship anyone else would be doing yourself and God a disservice. So I am one of Jehovah's Witnesses because I believe I have the truth (sic) faith, and to teach someone that it would be okay to engage in things that are unscriptural, I would be a hypocrite and I cannot do that. We encourage the children, you know, to tell your daddy what you've learned, tell him about the paradise after Armageddon, tell him—be obedient to him, that you are required to be obedient to your parents except when they, what—what we require conflicts with God's law if they are obedient to him.

They are well-behaved children, they love their daddy, and they know we expect them to behave themselves over there. We expect them to tell the truth no matter what the consequences might be to the best of their ability. We have a very loving environment, but we have not discouraged love for their father. We've not told them, as you have stated on several occasions, we have not told them that to go over to their father's house they would die.

Armageddon does not mean the end of the world, as you have said, and hell is not a burning place of torment, as I am assuming many people believe, so when we speak of hell, when we speak of Armageddon, these aren't frightening things to them. They know that Armageddon is not aimed at those serving Jehovah but those who are wicked, so they know that they are not going to be the object of Jehovah's war if they remain faithful to Jehovah.

But being youngsters, I don't know at what age Jehovah will hold them accountable. It's between them and Jehovah, I cannot force them serve any god. I can just train them with what I know, with the Bible, and with what I have and that's the best that I can do. We teach them that you need to love your father. Perhaps if you would tell your father about paradise, maybe he would understand what it is, you know, that we're teaching, that after Armageddon, it doesn't mean destruction of the earth, it means a paradise of the earth according to what the Bible says, so what we're teaching them is not frightening. Instead it is something to look forward to and we put in terms they can understand and no matter how young they are they're not too young to know the difference between right and wrong, the difference in telling the truth and telling an untruth.

In her brief, Marianne insists that the following questions and Lawrence's answers deprived her of her rights under both constitutions:

Q. Did you talk to the children about Christmas this year?

A. Yes, we did.

Q. What did they tell you?

A. We started talking about making a list for Santa Claus and talking about putting up a Christmas tree and things like that, Christmas presents and they just both looked at me and Nicholas looked at me and said they didn't want any Christmas presents and they didn't want anything to do with a Christmas tree and that they didn't want to celebrate Christmas and—

Q. Did you take them to church Sunday when you had them?

A. Yes, we did.

Q. Did you discuss going to church with them?

A. I certainly did.

Q. Did they intimate any fears to you, and if so, what were they?

A. They both were very nervous when I was—after I gave them a bath and was putting clothes on them. And it was a look I really—I just had not seen on either of their faces before. They said that mommy had told them that if they go to my church, that they won't survive Armageddon and that, I would go downstairs.

\* \* \* \* \* \*

Q. If they [the children] were with you, I suppose you would celebrate Christmas and birthdays and that sort of thing?

A. Yes, sir, I certainly would.

Q. That's going to differ greatly.

[Marianne's Attorney]: Your Honor, object to these referenced holidays because I think it has a religious bias.

\* \* \* \* \* \*

THE COURT: What is the grounds of your objection?

[Marianne's Attorney]: Religion.

THE COURT: Overruled.

\* \* \* \* \* \*

Q. Now, I believe you previously mentioned, your feelings about where you viewpoint on Marianne's religious beliefs.

A. Yes, I have.

Q. And what are those viewpoints again?

A. I don't like it. I'm very unhappy as to what it's doing to my children and the effects it's having on them.

In her brief, Marianne insists that the following questions and a psychologist's answers deprived her of her rights under both constitutions:

Q. Now, considering emotional blackmail and knowing what is good in your expert opinion for children and so forth which you've been shown to be qualified as being ... how do you feel about someone who would tell their children that if you go live with your father, you're not going to survive Armageddon and go to paradise, but you've got to come and stay with me in order to go paradise? Do you think that's—

A. I think—

Q. Let me finish the question. Do you think that's appropriate behavior for an adult to tell their children?

A. I think if that was their religious views it would be.

Q. You think that's appropriate?

A. It wouldn't be my views.

Q. I'm not asking about views, Dr. Price. I'm asking you if you think that's an appropriate behavior?

A. For a person who has a certain belief, yes, I would. For someone who didn't have a certain belief, no.

\* \* \* \* \* \*

In her brief, Marianne insists that the following questions and one of the children's schoolteacher's answers deprived her of her rights under both constitutions:

Q. So I'm not going to go into that with you. I think we're all glad that he is. Just as a point of interest though, on Halloween do y'all have a kind of a—I remember when I was in school we had kind of a Halloween party there in class ... Do you still do that?

A. We have activities that, you know, we correlate into our class work that are fun activities for them, and then they do have a party on that day itself.

\* \* \* \* \* \*

Q. All right. Is the party in a—in the middle of the day or morning or afternoon?

A. It is scheduled to be the last period of the day.

Q. I'm just interested in knowing what does Nicholas do during that party, or what did he do?

A. His mother came and picked him up from school.

Q. Took him out of there so he was not allowed to participate in the party?

A. Yes, sir.

Q. So whether or not, you know, being taken away from that makes him sad or not, you wouldn't know because he wasn't there?

A. Yes sir.

 \* \* \* \* \* \*

Q. And also when I was in school we use to have—of course, I don't know if they do this any more or not, but we used to say the pledge of allegiance. Do ya'll do that any more or is that against the law?

A. We do but we do not do it everyday. In our building it does not come up through an intercom system. It's up to each teacher to do it at her discretion.

 \* \* \* \* \* \*

Q. Good for you. So it's not totally against the law to do that?

A. We are able to do so.

Q. Does Nicholas say the pledge of allegiance?

A. No, sir.

Q. Why not?

A. As I understand, this is part of their belief that they do not salute the flag.

Q. What does he do? Is that when he just says at his desk?

A. He just stands there by his desk. Generally, when I do it, it would be just before the children got ready to go home and they would have, you know, all of their things ready to go home and we would just stand up and say the pledge just before going home.

Q. Do you know how he feels about that?

A. I've never talked to him about it.

Q. Just as you never talk to him about leaving when he can't stay at the parties?

 \* \* \* \* \* \*

Q. Now, Christmas is coming up. Again, when I was in school we had kind of a Christmas party where people exchanged gifts. Do y'all still do that?

A. Yes, sir.

Q. Make something at home?

A. I don't remember how we do it.

Q. Do you make something, buy something or how does that go?

A. I am sending home a note that will ask them to buy a gift between $1.50 and $2.00.

Q. Are you going to send a note home with Nicholas?

A. There is some other information on the note so it will go home.

Q. What would happen? You don't know I don't guess, or do you know what's going to happen when that party comes around?

A. I can only assume he won't attend.

Q. So he won't receive a gift with the other children?

A. No, sir.

 \* \* \* \* \* \*

In her brief, Marianne insists that the following questions and her mother's answers deprived her of her rights under both constitutions:

Q. What are you going to—well, I really just have one other question for you. If Larry were telling your grandchildren that if they went to live with your daughter they would go to hell, how would you feel about that?

A. I wouldn't feel very good about that.

Q. Would you think that's a horrible thing to say to your grandchildren?

A. I think there are ways of saying things that might not be horrible.

Q. Well, saying it that way, would you think that would be a horrible thing to say to a six and five year old?

A. Yes.

Q. Would you think it would be damaging to them?

A. I'm not sure that the children would fully understand the implication of the words.

 \* \* \* \* \* \*

Q. All right. Would it surprise you to learn that your daughter has admitted saying the same thing except in reverse? Would that surprise you?

A. Well, no it wouldn't surprise me.

Q. Well, you just testified a moment ago that you thought she was—went through a long, I think, 3 or 4 minutes about that she was wonderful, caring, a great mother and everything else. Why wouldn't that surprise you that she would say such a thing?

A. Because it's a—what they believe, and—

Q. Who is they?

A. The Jehovah's Witnesses.

Q. And so if they believe it—well—

A. I believe that the way she treats them and loves them and raises them will overcome everything. I believe in time they will understand and they really believe that she's their mother, and if she tells them that it is her privilege. I don't agree with it.

For the purposes of this opinion, we assume, but do not decide, that all of these questions and answers concern Marianne's religious beliefs and practices. Nevertheless, other than the objection "religious bias" directed to a question put to Lawrence as set forth above, which was made near the end of the three day trial, Marianne failed to object to any of the questions and testimony concerning her religious beliefs and practices on the ground that it violated her constitutional rights. Marianne contends, however, that because the evidence regarding her religious beliefs and practices violated her rights under the First Amendment of the United States Constitution and article I, section six of the Texas Constitution, error in the admission of such testimony was fundamental.

Recently, the Amarillo Court of Appeals addressed this issue. In *Knighton v. Knighton*, 723 S.W.2d 274 (Tex.App.—Amarillo, 1987, no writ), the court held that, because evidence regarding the mother's religious beliefs admitted in a child custody case was of constitutional dimension, error was not waived by failure to object to the testimony. *Knighton*, 723 S.W.2d at 283 ("[t]he error, therefore, being of constitutional dimension, is fundamental"). In addition, the court held that the mother's withdrawal of her motion for mistrial, after the trial court indicated that it would be granted, did not waive error in the admission of evidence concerning the mother's religious beliefs. The court stated:

> If the interest of [the mother] alone was involved in this case, [the father's] waiver argument would be compelling, since, if the court's offer of a mistrial had been accepted, it would have given [the mother] the relief from earlier error, which at the time she thought egregious enough to require mistrial. However, in a case involving the custody of a child or children, the interests of the State are involved since it is its duty as a sovereign to look after, and protect, the welfare of children located within its boundaries. *Wicks v. Cox*, 146 Tex. 489, 208 S.W.2d 876, 878 (1948); *Woodard v. Texas Dept. of Human Resources*, 573 S.W.2d 596, 597 (Tex.Civ.App.—Amarillo 1978, writ ref'd n.r.e.); *Hollis v. Hollis*, 508 S.W.2d 179, 182 (Tex.Civ.App.—Amarillo 1974, no writ). No action of, or failure to take action by, [the mother] could waive that State interest.[1]

*Knighton*, 723 S.W.2d at 284.

We decline to follow the holding in *Knighton* that error of constitutional dimension is fundamental. It is well-settled that failure to object to the introduction of evidence waives any error. *Stonecipher v. Butts*, 686 S.W.2d 101, 103 (Tex.1985). It is equally well-settled that even constitutional errors may be waived by the failure to object. *In re M.A.B.*, 641 S.W.2d 621,

---

1. This statement was expressly disapproved by two members of the three member panel. *See Knighton*, 723 S.W.2d at 276 (Countiss, J., concurring); *Knighton*, 723 S.W.2d at 277 (Reynolds, C.J., dissenting).

623 (Tex.App.—Corpus Christi 1982, no writ); *Phillips v. Phillips*, 532 S.W.2d 161, 163 (Tex.Civ.App.—Austin 1976, no writ). Consequently, we conclude that error, if any, in the admission of evidence regarding Marianne's religious beliefs and practices was not fundamental merely because it may have violated Marianne's rights under the First Amendment of the United States Constitution and article I, section six of the Texas Constitution.

 We likewise decline to follow the statement in *Knighton* that, because of the State's interest in the welfare of children within its boundaries, error could not have been waived by the failure to object. Fundamental error survives today only in those rare instances in which the record shows on its face that the court lacked jurisdiction or that the public interest is directly and adversely affected as that interest is declared in the statutes and constitution of this state. *Cox v. Johnson*, 638 S.W.2d 867, 868 (Tex.1982); *Pirtle v. Gregory*, 629 S.W.2d 919, 920 (Tex.1982). While it is true that the State has an interest in the welfare of children within its boundaries, just as it has an interest in the welfare of all citizens within its boundaries, we fail to see how the State has a direct interest in the conservatorship of the children at issue in the present case, nor can we see how any interest of the State has been adversely affected by naming Lawrence, rather than Marianne, as managing conservator of the children. Thus, we conclude that the State's general interest in the welfare of its citizens cannot form the basis for holding that error cannot be waived by a party to the suit.[2] To hold otherwise would be "to embrace [the argument's] logical extension that in an appeal from a conservatorship determination, the aggrieved part[y] is entitled to ignore all procedural requirements of the predicate for and the assignment of error, and have the best interest of a child reviewed as a matter of unassigned funda-

mental error founded on the State's interest." *Knighton*, 723 S.W.2d at 277 (Reynolds, C.J., dissenting). Thus, we hold that error, if any, in the admission of testimony regarding Marianne's religious beliefs and practices was not fundamental merely because the State has an interest in promoting the welfare of children within its boundaries.

Accordingly, we hold that, by failing to object, Marianne waived any error in the admission of evidence regarding her religious beliefs and practices.

 Regarding the one instance in which Marianne objected to a question on the ground of "religious bias," we assume, but do not decide, that the question was indirectly related to Marianne's religious beliefs and practices. Nevertheless, we hold that, even if the objection was sufficient to apprise the trial court of the nature of her complaint, error, if any, in overruling the objection was harmless. In light of the extensive unobjected-to testimony regarding Marianne's religious beliefs and practices, we hold that the failure to sustain her objection to one question was not such a denial of Marianne's rights as was reasonably calculated to cause, and probably did cause, the rendition of an improper verdict. *See* TEX.R.APP.P. 81(b)(1). Accordingly, we overrule Marianne's first point of error.

In her next two points of error, Marianne contends that there is no evidence, and that the evidence is factually insufficient, to support the jury's answer to special issue number two. Marianne contends that the testimony regarding her religious beliefs and practices was incompetent evidence and that such evidence cannot be considered in a review of the legal and factual sufficiency of the evidence. Consequently, she contends that if this evidence is excluded, there is no evidence, or there is factually insufficient evidence, to support the jury's answer to special issue number two.

 We agree that incompetent evidence, even if unobjected to at trial, may

2. We express no opinion regarding Marianne's standing to assert the State's interest in this cause and this opinion is not to be understood

as holding that a parent in a conservatorship proceeding has standing to assert such an interest.

not be considered in determining the legal and factual sufficiency of the evidence. *Engineered Plastics, Inc. v. Woolbright*, 533 S.W.2d 906, 909 (Tex.Civ.App.—Tyler 1976, no writ); *see Texas Department of Public Safety v. Nesmith*, 559 S.W.2d 443, 447 (Tex.Civ.App.—Corpus Christi 1977, no writ). We conclude, however, that we need not address the question of whether the testimony regarding Marianne's religious beliefs and practices was incompetent evidence, because we conclude that, even excluding such testimony, the remaining evidence is legally and factually sufficient to support the jury's answer to special issue number two.

Special issue number two asked:

Do you find from a preponderance of the evidence that the retention of MARIANNE CHAISSON as managing conservator would be injurious to the welfare of the children?

Answer: "We do" or "We do not."

Answer: We do

*See* TEX. FAM.CODE ANN. § 14.-08(c)(1)(B) (Vernon 1986).

■ The "injurious retention" test focuses upon the circumstances of the present managing conservator to determine if retaining the child in the custody of that managing conservator would be injurious to the child's present and future welfare. *See e.g., Ogrydziak v. Ogrydziak*, 614 S.W.2d 474, 477–78 (Tex.Civ.App.—El Paso 1981, no writ); *see also* 4 B. KAZAN, FAMILY LAW, TEXAS PRACTICE AND PROCEDURE § 80.03[2][c] (1986). The possessory conservator's circumstances have no direct bearing upon the injurious retention inquiry. *See Jones v. Cable*, 626 S.W.2d 734, 736 (Tex.1981); *In re Y*, 516 S.W.2d 199, 203 (Tex.Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.). Consequently, in considering points of error two and three, we will consider only the circumstances of Marianne to determine whether there is no evidence, or whether the evidence is insufficient, to support the jury's finding in response to special issue number two.

■ In her second point of error, Marianne contends that there is no evidence to support the jury's answer to special issue number two. In reviewing a no evidence point of error, this court must consider only the evidence and inferences tending to support the jury verdict and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 833 (Tex. 1965); *In re King's Estate*, 150 Tex. 662, 664, 244 S.W.2d 660, 661 (Tex.1951). In the present case, the evidence reflected that Marianne had remarried since her divorce and that her husband was "in charge of everything" in the household. Marianne testified that the children were spanked with a belt and a paint stick and she conceded that "once or twice ... maybe three times," the spankings left bruises and welts on the children. She agreed that she "had a concern" that her husband sometimes got "carried away" in disciplining the children. She also testified that she had put hot pepper juice on the children's tongues to punish them.

Lawrence testified that in September of 1983, he returned from a trip overseas and learned that Marianne had moved away with the children. He was unable to locate them until "approximately the third week of October," when Marianne sent him a letter informing him of her new address. Lawrence also testified that the children began calling him "Larry" and Marianne testified that she instructed the children to call her new husband "sir" or "daddy." Lawrence testified that when he asked Marianne why the children called him "Larry", Marianne "reiterated that she was remarried, they had a good family, and the boys had a new family, and I was not a part of it."

A court appointed psychologist, who examined Marianne, Lawrence, and the children, testified that one of the children was not permitted to display Lawrence's photograph in his room. The psychologist testified that "I spoke to [Marianne] about this. She was very angry and said that 'Larry does not deserve to be in my house, in my husband's house, or in my children's house.'" He also testified that "the chil-

dren are made to call [Marianne's new husband] 'Daddy' and that "they are spanked if they do not call [him] 'Daddy.'" The psychologist further testified that the children "verbalized considerable apprehension and fear that they would be spanked" and that Marianne did not believe the fear existed. The psychologist characterized the children's behavior with their mother as "pretty stiff, nonspontaneous, almost ... like little robots." He recommended that Lawrence be named managing conservator of the children.

We hold that this evidence is some evidence from which the jury could conclude that retention of Marianne would be injurious to the welfare of the children. Accordingly, we overrule Marianne's second point of error.

In her third point of error, Marianne contends that the evidence is factually insufficient to support the jury's answer to special issue number two. In reviewing the factual sufficiency of the evidence to support the jury's answer to a special issue, this court must review all the evidence and, if the evidence is insufficient to support the jury's answer, must set aside the judgment and remand the cause to the trial court for a new trial. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986); *Garza*, 395 S.W.2d at 823.

In addition to the evidence cited above, the following evidence was presented at trial. Marianne testified that the children were happy and emotionally stable. She stated that her husband had taken the children camping, hiking, and swimming and that he played games with the children. The children's schoolteachers testified that the children were well-behaved and earned good grades. Both teachers testified that neither of the children "behaved like robots." A psychologist retained by Marianne testified that Marianne showed "strong feelings of love and concern for her children." He testified that he had extensive experience dealing with physically and sexually abused children and that neither child exhibited symptoms of physi-

cal abuse. He further testified that neither child spontaneously mentioned spankings to him and that he saw no signs of fear of their stepfather. The psychologist testified, however, that because he had not examined Lawrence, he was unable to recommend which parent should be managing conservator of the children.

Although there was conflicting evidence regarding whether retention of Marianne as managing conservator would be injurious to the welfare of the children, the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *First City Bank-Farmers Branch v. Guex*, 659 S.W.2d 734, 739 (Tex. App.—Dallas 1983) *aff'd* 677 S.W.2d 25 (Tex.1984). Thus, the jury was free to believe the testimony of Lawrence and the court appointed psychologist tending to show that retention of Marianne as managing conservator would be injurious to the welfare of the children and to disbelieve the contrary evidence tending to show that retention of Marianne as managing conservator would not be injurious to the welfare of the children. Consequently, we hold that the evidence is factually sufficient to support the jury's answer to special issue number two. We overrule Marianne's third point of error.

In her fourth and fifth points of error, Marianne contends that there is no evidence, and that the evidence is factually insufficient, to support the jury's answer to special issue number three. That special issue asked:

Do you find from a preponderance of the evidence that the appointment if LAWRENCE J. RUTLAND as the new managing conservator would be a positive improvement for the children?

ANSWER: "We do" or "We do not."

ANSWER: <u>We do</u>

*See* TEX. FAM.CODE ANN. § 14.-08(c)(1)(C) (Vernon 1986).

■ The "positive improvement" test focuses on the circumstances of the possessory conservator to determine if his appoint-

ment as the child's new managing conservator would be a positive improvement for the child's present and future well being. *See Jones,* 626 S.W.2d at 736; *In re Y,* 516 S.W.2d at 203. *See also,* 4 B. KAZEN, *supra,* § 80.03[2][d]. Thus, in considering points of error four and five we must consider only the circumstances of Lawrence to determine whether there is no evidence, or whether the evidence is factually insufficient, to show that his appointment as managing conservator would be a positive improvement for the children.

■ In her fourth point of error, Marianne contends that there is no evidence to support the jury's answer to special issue number three. Under this no evidence point of error, therefore, we must consider only the evidence and inferences supporting the jury's answer and disregard all evidence and inferences to the contrary. *Garza,* 395 S.W.2d at 833; *In re King's Estate,* 150 Tex. at 664, 244 S.W.2d at 661.

Marianne testified that the children love Lawrence and that if the children lived with Lawrence, "he could provide for them very abundantly in a material way." The court appointed psychologist testified that the children had a loving relationship with their father and that the children's interaction with their father was "more spontaneous" and "seemed to be more like you would expect five and six-year-olds to be" when with their father. He further testified that, in his opinion, the children would prefer to live with Lawrence and he recommended that Lawrence be named managing conservator of the children. In addition, an investigator from Family Court Services testified that he met Lawrence and the children, had seen Lawrence's home, and recommended that Lawrence be made managing conservator of the children.

Lawrence testified that he believed Marianne had alienated the children from him and "there has been emotional problems that I have seen with the children." He testified, however, that he would encourage the children to see Marianne if he were given custody because he wanted the chil-

dren to love both parents. Lawrence further testified that when he sees the children "they're very uneasy and they have a nervousness that you can just see about them," but that after "a couple of days," they "begin playing like they used to." He also testified that he did not feel it would be detrimental to the children if they were taken away from their mother; instead, he stated "I think it would be a definite improvement."

Thus, we hold that there is some evidence to support the jury's answer to special issue number three. We overrule Marianne's fourth point of error.

In her fifth point of error, Marianne contends that the evidence is factually insufficient to support the jury's answer to special issue number three. In addition to the evidence cited above, the following testimony was introduced.

Lawrence conceded that, because he is a pilot, he would be away at times during the day and night, and that he would frequently fly on weekends. However, he also testified that he would be home about fifteen days a month. He testified that his mother planned to move from Illinois to Dallas in order to care for the children when he was gone. The evidence showed that his mother was sixty-seven years old at the time of trial, could not drive, and that once, when she was keeping the children, one of the children became ill and she had to call Marianne to take him to the doctor.

In addition, Lawrence conceded that, in the past, he had told the children that Marianne's new husband was "bad." He also admitted, when asked whether he had ever slapped the children on the face, that he had done so, although he characterized the act as a "light tap," and he further admitted that he had "hit them on their arms." Lawrence also testified that in the past he had not taken advantage of all the visitation allowed him under the divorce decree.

Thus, although there was conflicting evidence regarding whether appointment of Lawrence as managing conservator of the

children would be a positive improvement, we hold that the jury, as the sole judge of the credibility of the witnesses, was free to resolve the conflicting evidence in favor of Lawrence. Accordingly, we hold that the evidence is factually sufficient to support the jury's answer to special issue number three. We overrule Marianne's fifth point of error.

In her sixth point of error, Marianne contends that the trial court erred in failing to grant her motion for new trial. Her argument is based on the premise that her rights under the First Amendment of the United States Constitution and article I, section six of the Texas Constitution were violated. Because we have held that Marianne waived any complaint regarding violation of her constitutional rights, we hold that the trial court did not abuse its discretion in failing to grant her motion for new trial. *See Mission Insurance Co. v. Hill*, 679 S.W.2d 578, 579 (Tex.App.—Texarkana 1984, writ ref'd n.r.e.) (trial court's ruling on motion for new trial will not be disturbed absent an abuse of discretion). Accordingly, we overrule Marianne's sixth point of error.

In her seventh point of error, Marianne contends that the trial court erred in failing to grant her motion for judgment notwithstanding the verdict. Before a trial court can render judgment notwithstanding the verdict, there must be no evidence of probative force from which the jury could have made the complained-of findings. *See Rego Co. v. Brannon*, 682 S.W.2d 677, 680 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). Because we have held that there is some evidence to support the complained-of jury findings, we hold that the trial court did not err in denying Marianne's motion for judgment notwithstanding the verdict. We overrule Marianne's seventh point of error.

Affirmed.