**Opinion filed October 16, 2025**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00104-CV
_____

**KEEYANNA NATALIE PARSON, Appellant**

**V.**

**AUSTON KADE PARSON, Appellee**

**On Appeal from the 318th District Court**
**Midland County, Texas**
**Trial Court Cause No. FM72614**

### M E M O R A N D U M   O P I N I O N

Appellant, Keeyanna Natalie Parson, appeals the trial court's final decree of divorce dissolving her marriage to Appellee, Auston Kade Parson. Keeyanna raises two issues on appeal, arguing that the trial court abused its discretion by: (1) appointing Auston as the conservator with the exclusive right to designate the child's primary residence; and (2) improperly considering the religious faith of Keeyanna and her family in reaching its decision. We affirm.

## I. *Factual and Procedural History*

Auston and Keeyanna married on January 26, 2021. Their son, J.P.,[1] was born on July 3, 2021. On July 6, 2023, Auston filed a petition for divorce. Keeyanna later filed a counterpetition for divorce. Both parties sought to be named as the conservator with the exclusive right to designate J.P.'s primary residence. The case proceeded to a final hearing, at which the following evidence was presented.

### A. *Auston's Testimony*

Auston testified that he met Keeyanna in Honolulu, Hawaii, while serving in the Navy. After their marriage and the birth of J.P., the couple continued to reside in Hawaii with Keeyanna's parents. Auston stated that he received an "other than honorable" discharge from the Navy after testing positive for cocaine, and the family eventually moved to Mississippi to continue living with Keeyanna's parents. In July 2022, the couple moved to Midland, where Auston's parents reside, and began living in their own apartment. They eventually moved into a house. Auston stated that they would see his family frequently, including for holidays and birthdays. Upon moving to Midland, Auston began working for his father as a landman while Keeyanna stayed home to care for J.P. On July 3, 2023, Auston visited his parents and a friend after work, but when he arrived home, he discovered the house empty. Auston stated that "it appeared that there had been bags packed." He later learned that Keeyanna had taken J.P. to Mississippi.

Shortly thereafter, Auston filed a petition for divorce. The parties reached an agreement for alternating two-week periods of possession of J.P., and the trial court entered a temporary order pursuant to the agreement. During one of Auston's periods of possession in Midland, Keeyanna and J.P. stayed at Auston's residence. After a few hours, Auston told Keeyanna that he was going to take J.P. to his father's

---

[1]To protect the privacy of the minor child, we use initials to refer to the child. TEX. FAM. CODE ANN. § 109.002(d) (West Supp. 2024).

house for dinner. Auston stated that Keeyanna became very agitated, and when he tried to leave with J.P., Keeyanna "ripped him from [Auston's] arms." Keeyanna then took J.P. to a bedroom and locked the door. Auston contacted the police, who allowed him to take J.P. to his father's house. Auston spent the rest of his period of possession at a hotel and his father's house. When he returned, Auston discovered that "the house was a complete mess." The leg to a television was broken, and he discovered a used condom in the trash can.

Auston testified that he has the financial ability to provide for J.P as well as flexibility with his work schedule to take leave when J.P. needs "caring for." Auston stated that his sixty-eight-year-old grandmother takes care of J.P. while Auston is at work. Auston said that he has no trouble providing transportation for J.P., while Keeyanna does not have an automobile or driver's license. He had concerns with J.P. living in Mississippi with Keeyanna's parents because he learned of three past instances of sexual abuse in the home that were not reported. Auston also had concerns with Keeyanna's mental health, as she had attempted suicide, had "cut herself" in the past, and had been committed to a mental hospital. As recently as April 2023, Auston observed scars on her leg from Keeyanna cutting herself. Auston expressed concern that Keeyanna's parents, who care for J.P. while she works, take J.P. to church services that last approximately three hours. Keeyanna's father is seventy years old, and her mother is sixty-five years old. Auston also is of the opinion that the school systems in Mississippi "are almost the worst in the country." While video chatting with J.P., Auston learned that Keeyanna was in a romantic relationship with someone, and he noticed that they were at someone else's house at the time. Auston has had trouble communicating with Keeyanna and her parents to arrange video chats with J.P. when J.P. is in Mississippi. When Auston has possession of J.P., they live alone in a house in Midland.

3

Auston admitted that he and Keeyanna have used controlled substances in the past, including mushrooms and marihuana. He also admitted to using cocaine, ecstasy, and acid. He testified that he used mushrooms when the family was on a trip in Colorado and that he was carrying J.P. on his shoulders while under the influence of the substance. Auston also stated that he and Keeyanna sold drugs in the past. However, Auston claimed that he has not used any controlled substances since July 20, 2023. Auston submitted to drug testing during the pendency of the case and tested negative on all tests. He stated that he drank alcohol on occasion. Further, Auston believed that he observed Keeyanna smoking marihuana while he was video chatting with J.P.

Auston claimed that Keeyanna logged into his e-mail while she was in Mississippi. He testified that he has been responsible for all of J.P.'s transportation between Texas and Mississippi throughout the duration of the case. On multiple occasions, Keeyanna refused his requests for a flexible pickup time for J.P. due to inclement weather. Auston began taking J.P. to his pediatrician at the end of his possession periods due to Keeyanna claiming that J.P. was in bad health. During a video chat with J.P., Auston observed that J.P. was attempting to brush his teeth with diaper rash cream, and Auston had to yell to get someone's attention to prevent that.

Auston acknowledged that Keeyanna took photographs that show his residence in a state of disarray. However, he believed Keeyanna staged the photographs. Auston claimed that he "[a]lmost always" keeps his home clean. Auston also believes that Keeyanna staged a photograph of a firearm in J.P.'s bedroom.

B. *Keeyana's Testimony*

Keeyanna testified that she currently works at Walmart and is studying to become a paralegal. She works from around 2:00 p.m. to 10:00 p.m., three to four days a week, and attends school Monday through Thursday from

8:00 a.m. to 10:30 a.m. When Keeyanna is unavailable, Keeyanna's parents watch J.P. Keeyanna stated that she does not currently have a driver's license and relies on her parents for transportation.

Keeyanna testified that Auston was emotionally abusive during their marriage and that he would often get intoxicated around J.P. She explained that Auston would accuse her of cheating and that he would often go to someone's house after work to use marihuana. She testified that she is seeing a counselor and that she talks to the counselor about her coparenting relationship with Auston and the emotional abuse she has suffered. Keeyanna stated that she attempted suicide when she was fifteen and has had issues with self-mutilation. She last cut herself in May 2023. Keeyanna explained that she has anxiety and depression and that she was recently diagnosed with Type II diabetes. She admitted to using mushrooms and marihuana in the past.

Keeyanna testified that she is in a relationship with someone in Mississippi and that she has taken J.P. to his residence. Keeyanna relayed that her parents are members of the Jehovah's Witness faith and that they take J.P. to church services. Her parents refrain from celebrating holidays pursuant to their faith. Keeyanna explained that the sexual abuse referenced by Auston occurred when she and her brother were younger and that her parents did not find out about the incidents until she was an adult. Keeyanna testified that she submitted urine samples for drug testing throughout the case and that she had only negative results.

Keeyanna testified that Auston would view pornography while J.P. was in the home. On one occasion, Keeyanna saw a naked picture of a young girl on Auston's phone, and Auston told her it was of his girlfriend from when Auston was fourteen. Keeyanna recalled a time when J.P. was in the hospital for four days with an illness, and Auston did not come to visit during his stay.

Keeyanna further testified that when she and Auston were together, she served as the primary caretaker for J.P. Auston's family did not like that he was married to

her because she is African-American. She said that Auston often used foul language and derogatory words including racist slurs, with Keeyanna, which he admitted to on cross-examination. Keeyanna stated that Auston's stepfather has felony DWI convictions and that he keeps guns at his house. She said that although she does not have a driver's license, she has had to drive when Auston was intoxicated. Keeyanna testified that Auston's home in Midland is extremely dirty and disorganized, while her home in Mississippi is very clean.

C. *Additional Testimony*

Erin Hobbs, a nurse that works for J.P.'s pediatrician, testified that J.P. is a happy, healthy kid and that she has not observed any signs of abuse or neglect. Erwin Medlock testified that he is married to Auston's grandmother. He stated that he is African-American and that he has not been treated differently by Auston's family due to his race. He has never heard Auston or his family use racist slurs.

Auston hired Christopher Whitlock, a private investigator, to surveil Keeyanna. Whitlock observed that Keeyanna would primarily work from 1:00 p.m. to 10:00 p.m. He testified that he observed J.P. in the possession of Keeyanna's parents most of the time.

Auston's mother testified that she is forty-four years old and works as a nurse intern. She stated that she spends a lot of time with J.P. while he is in Midland. She relayed that Auston and J.P. are very close, and Auston is very patient with J.P. She further testified that she is concerned about J.P.'s care in Mississippi because he is always in the care of Keeyanna's parents, and they spend a lot of their day at church where there is no childcare. Auston's mother acknowledged that her husband has felony DWI convictions but that he has been sober since 2016.

Auston's father testified that Auston is very kind, patient, and attentive toward J.P. His father acknowledged that Auston had trouble with marihuana use during Auston's marriage to Keeyanna. He stated that he has attended Alcoholics

6

Anonymous meetings with Auston and that Keeyanna was upset about this because she still used marihuana.

D. *The Trial Court's Rulings*

Following the final hearing, the trial court signed a final decree of divorce designating Auston as the conservator with the exclusive right to designate J.P.'s primary residence. The trial court issued findings of fact and conclusions of law, including the following findings:

> In determining which parent should establish the primary residence of the child, the Court based its ruling on the best interest of the child, including the following matters: the mother's abrupt move without notice; the mother taking the child to Mississippi; the work schedules of each of the parents; family support; the ability to provide and support the child; parental cooperation; demonstration of an ability to coparent; and the living arrangements that both parents have.

> In determining which parent should establish the primary residence of the child, the Court did not take into account or consider in any manner the race or religion of Petitioner, Respondent, their respective family members, or the child.

This appeal followed.

## II. *Right to Designate the Child's Primary Residence*

In her first issue, Keeyanna argues that the trial court abused its discretion by naming Auston as the conservator with the exclusive right to designate J.P.'s primary residence.

A. *Standard of Review & Applicable Law*

When the trial court appoints joint managing conservators, it must designate the conservator who has the exclusive right to determine the primary residence of the child. FAM. § 153.134(b)(1) (West 2014). In determining which joint conservator should have that exclusive right, the best interest of the child is the trial court's primary consideration, as it is in determining all "issues of conservatorship and possession of and access to the child." *Id.* § 153.002.

7

In determining the child's best interest, no unique set of factors need to be proved by a party or considered by the trial court. *In re B.G.J.*, 702 S.W.3d 886, 905–06 (Tex. App.—Eastland 2024, no pet.). The trial court may consider a variety of factors, including those set forth in *Holley v. Adams*. *Id.*; *see Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371–72. Under Section 153.134(a) of the Texas Family Code, the trial court should also consider:

> (1) whether the physical, psychological, or emotional needs and development of the child will benefit from the appointment of joint managing conservators;

> (2) the ability of the parents to give first priority to the welfare of the child and reach shared decisions in the child's best interest;

> (3) whether each parent can encourage and accept a positive relationship between the child and the other parent;

> (4) whether both parents participated in child rearing before the filing of the suit;

> (5) the geographical proximity of the parents' residences;

> (6) if the child is 12 years of age or older, the child's preference, if any, regarding the person to have the exclusive right to designate the primary residence of the child; and

> (7) any other relevant factor.

FAM. § 153.134(a).

8

We review a trial court's decisions regarding conservatorship, including a determination of which conservator will have the right to establish the child's primary residence, for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). A trial court abuses its discretion if it acts in an arbitrary and unreasonable manner or when it acts without reference to any guiding principles. *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.).

Legal and factual sufficiency challenges are not independent grounds of error in family law cases, but rather are factors that we use to determine whether the trial court abused its discretion. *In re E.R.D.*, 671 S.W.3d 682, 686–87 (Tex. App.—Eastland 2023, no pet.); *In re A.J.E.*, 372 S.W.3d 696, 698 (Tex. App.—Eastland 2012, no pet.). In determining whether the trial court abused its discretion, we consider whether it had sufficient information upon which to exercise its discretion and, if so, whether it erred in the application of that discretion. *In re J.H.C.*, No. 11-17-00187-CV, 2019 WL 2557542, at *6 (Tex. App.—Eastland June 20, 2019, no pet.) (mem. op.). In conducting our analysis, the sufficiency-of-the-evidence review is part of the first inquiry. *Id.* After we evaluate the sufficiency of the evidence, we consider whether, based on that evidence, the trial court made a reasonable decision. *Id.*

A legal sufficiency review requires that we determine whether the evidence in support of the challenged finding rises to a level that would enable reasonable and fair-minded people to arrive at the decision under review. *W & T Offshore, Inc. v. Fredieu*, 610 S.W.3d 884, 897–98 (Tex. 2020); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). We will sustain a challenge to the legal sufficiency of the evidence that supports a disputed fact finding when (1) evidence of a vital fact is absent, (2) the rules of law or evidence prohibit the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the

9

opposite of the vital fact. *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 782–83 (Tex. 2020) (citing *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004)); *City of Keller*, 168 S.W.3d at 810.

In reviewing a factual sufficiency challenge, we must consider and weigh all the evidence—not just the evidence that support's the trial court's finding—and determine whether the evidence supporting the order is so weak or against the overwhelming weight of the evidence such that the order is clearly wrong and manifestly unjust. *See City of Keller*, 168 S.W.3d at 826; *E.R.D.*, 671 S.W.3d at 687.

If the evidence is conflicting, we must presume that the factfinder resolved any inconsistencies in favor of the order if a reasonable person could do so. *City of Keller*, 168 S.W.3d at 821. In this regard, the trial court, as the factfinder, is in the best position to observe and assess the witnesses, their demeanor, and their credibility, and we afford great latitude and deference to the trial court when determining the best interest of a child. *E.R.D.*, 671 S.W.3d at 687; *In re S.E.K.*, 294 S.W.3d 926, 930 (Tex. App.—Dallas 2009, pet. denied).

B. *Analysis*

Keeyanna argues that the trial court's decision allowing Auston to determine the primary residence of the child was an abuse of discretion because its "decision does not hold up to scrutiny" under the best-interest factors described above. Auston responds by noting that the evidence, when viewed under the proper standard of review, provides sufficient evidence for the trial court to have exercised its discretion as it did.

The record shows that Auston has the financial means and family support to care for J.P. He has stable employment and housing. Auston presented testimony that he is a capable and caring father to J.P. Both Auston and Keeyanna have engaged in the use of illegal drugs, and they have also sold narcotics. However, both

10

tested negative for drug use throughout the pendency of the case. While there was evidence that Auston consumed alcohol excessively in the past, he has been sober throughout the litigation and has attended Alcoholics Anonymous meetings. There was conflicting evidence regarding the cleanliness of Auston's home, which we presume the trial court resolved in favor of its ruling. *See City of Keller*, 168 S.W.3d at 821. We also defer to the trial court's credibility determinations regarding Keeyanna and Auston, who had conflicting testimony as to their relative parenting abilities, including Keeyana's allegations regarding racial animus among Auston's family and Auston's past use of pornography. *See E.R.D.*, 671 S.W.3d at 687.

As to Keeyanna, the trial court heard evidence that she is not able to transport J.P. because she does not own a vehicle or have a driver's license. Keeyanna exhibited self-harming behavior such as suicide attempts and self-mutilation. Based on the foregoing, we conclude the evidence supporting the trial court's ruling rises to a level that would enable reasonable and fair-minded people to arrive at the decision under review. *See Fredieu*, 610 S.W.3d at 897–98.

The parties also presented conflicting evidence regarding their varying faults in the marriage's dissolution and their ability to coparent. However, in considering and weighing all the evidence, we cannot conclude that the evidence supporting the trial court's decision is so weak or against the overwhelming weight of the evidence such that it is clearly wrong and manifestly unjust. *See City of Keller*, 168 S.W.3d at 826. Accordingly, we hold that the trial court had sufficient information upon which to exercise its discretion and that it did not act arbitrarily or unreasonably in the application of that discretion. *See J.H.C.*, 2019 WL 2557542, at *6. Specifically, we note that the evidence is sufficient to support the trial court's best interest determination under the *Holley* factors, and the factors listed in Section 153.134(a)(2), (3), and (4) of the Texas Family Code. *See* FAM. § 153.134(a). We overrule Keeyanna's first issue.

### III. *The Religious Faith of the Parties Was Not Considered*

In her second issue, Keeyanna argues that the trial court improperly considered the religious faith of Keeyanna and her family in reaching its conservatorship decision. In support, Keeyanna cites to case law declaring that it is "beyond the power of a court, in awarding the custody of a child or children to prefer the religious views or teachings of either parent, even though the beliefs and practices of one parent might be more 'normal' or more in accord with majority religious views or practices." *Matter of Marriage of Knighton*, 723 S.W.2d 274, 278 (Tex. App.—Amarillo 1987, no writ) (citing *Salvaggio v. Barnett*, 248 S.W.2d 244, 247 (Tex. App.—Galveston 1952, writ ref'd n.r.e.)).

As an initial matter, we note that Keeyanna did not object to any testimony regarding her family's religious views or practices, as she concedes. Therefore, she has not preserved for our review any issue regarding the admission of testimony or evidence regarding her or her family's religious views or practices. *See Matter of Marriage of Rutland*, 729 S.W.2d 923, 932 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) ("[B]y failing to object, [the appellant] waived any error in the admission of evidence regarding her religious beliefs and practices.").

Nevertheless, there is no indication in the record that the trial court relied on the religious views or practices of either party or their respective families in reaching its decision. Importantly, the trial court issued a finding of fact specifically stating that it "did not take into account or consider in any manner the race or religion" of Auston, Keeyanna, their respective family members, or the child in making its conservatorship determination. We have already held that the trial court's decision to designate Auston as the conservator with the right to designate J.P.'s primary residence was informed by sufficient evidence and was not an abuse of discretion.

12

Here, there is no indication that the trial court reached its decision on an improper basis.  We overrule Keeyanna's second issue.

## IV.  *This Court's Ruling*

We affirm the trial court's judgment.


W. BRUCE WILLIAMS
JUSTICE


October 16, 2025

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.