

## COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-09-00272-CV

LORI ROSENSTEIN                                                    APPELLANT

V.

HOWARD ROSENSTEIN                                                  APPELLEE

-----------

FROM THE 231ST DISTRICT COURT OF TARRANT COUNTY

-----------

## MEMORANDUM OPINION[1]

----------

In this appeal from a divorce and suit affecting the parent-child relationship, Appellant Lori Rosenstein raises no property issues. Instead, Lori contends that the trial court abused its discretion (1) by conducting with no notice, in her absence, and over her trial counsel's objection a bench trial on possession, access, and child support after she received a favorable jury verdict the previous day; (2) by modifying the possession order to give Appellee Howard

---

[1]*See* Tex. R. App. P. 47.4.

Rosenstein more days of possession of their two children than Lori, who the jury named as joint managing conservator with the exclusive right to determine the primary residence of the children; and (3) by reducing child support based on Howard's estimate of future earnings instead of relying on actual net resources, violating section 154.062 of the family code. Lori also contends that (4) the divorce decree giving Howard possession of the children on holidays based on his Jewish religion, which are longer than the holidays on which possession of the children was awarded her, violates the Establishment Clause of the First Amendment to the Constitution of the United States as read into the Fourteenth Amendment Due Process Clause. Because we hold that the trial court did not abuse its discretion by conducting the bench trial in Lori's absence when her lawyer was present and participated, that Lori did not preserve her notice complaint, and that the trial court did not abuse its discretion in setting child support, we affirm the trial court's judgment as to all matters except the possession of the children. Because we hold that the possession order violates Lori's rights under the Establishment Clause, we reverse the portion of the trial court's judgment addressing possession and remand this case to the trial court solely for a new trial on that issue.

## I. Summary of Facts and Procedural Facts

In 2005, Lori filed for divorce from Howard after more than nine years of marriage. About three and one-half years after she filed her petition, a jury heard some issues concerning the couple's children, R.M.R. and R.D.R., born in 1996

2

and 1999 respectively. Lori chose not to provide the reporter's record of the jury trial. Question 3 of the jury charge asked, "Which joint managing conservator should have the following exclusive rights: 1. Choice of religion" and "2. Educational decisions." The jury found that Lori and Howard should be joint managing conservators, that Lori should have the exclusive rights to designate the children's primary residence and to make their educational decisions, and that Howard should have the exclusive right to direct the children's religious training.[2]

Lori and Howard reached an agreement on property issues. The day after the jury portion of the trial ended, the visiting judge hearing this matter conducted a bench trial on the remaining issues of possession, access, and child support. Lori was not present at the bench trial, but her trial counsel appeared and participated. There is no evidence that she requested a continuance. After Lori's trial counsel cross-examined Howard, the sole witness, she stated,

> [LORI'S TRIAL COUNSEL]: . . . [I] pass—to the extent that we are having a trial and I object. There was no notice. I've got no documents to present to the Court what the cost of insurance, and I have not had an opportunity to bring my client.
>
> THE COURT: Your client had notice of this hearing today. It was given to her in open court yesterday. We've been in trial for eight days. It's overruled.

---

[2]See Tex. Fam. Code Ann. § 105.002(c)(1)(B), (D), (2)(C) (West 2008) (stating that party is entitled to verdict on issue of conservatorship and the determination of which joint managing conservator has the exclusive right to designate the child's primary residence but that the trial court may not submit to the jury questions on the issue of any other right or duty of a conservator).

3

After the trial was completed, the visiting judge who heard this matter signed a decree on November 21, 2008, awarding Lori the exclusive right at all times to make decisions concerning the children's education and repeatedly awarding Howard the exclusive right at all times to choose the children's religion. But the decree also awarded Lori the exclusive right to choose the children's religion during her period of possession. That version of the decree also awarded Howard superior, exclusive possession of the children on several Jewish religious holidays: Rosh Hashanah, Yom Kippur, Sukkot, Shemeni Atzeret, Simchas Torah, Hanukkah, Tu Bishvat, Purim, Lag Baomer, Passover, Shavuot, and Tisha B'Av.

The visiting judge hearing this matter issued findings of fact and conclusions of law related to the November 2008 decree on January 5, 2009. The same visiting judge heard Lori's amended motion for new trial, which she had filed December 19, 2008. The visiting judge denied Lori's motion for new trial but modified the decree on its own motion on January 30, 2009.

Lori filed a motion for new trial from the modified judgment on February 20, 2009. A different visiting judge issued amended findings of fact and conclusions of law on March 16, 2009. An elected judge of a civil district court[3] granted Lori's motion for new trial on March 26, 2009. On May 12, 2009, however, the visiting judge who heard this case struck the amended findings of fact and conclusions of law issued by the other visiting judge. And on May 14, 2009, the visiting judge

_____

[3]*See* Tex. R. Evid. 201(b).

who heard the case signed an agreed order setting aside the elected civil district judge's order granting Lori's motion for new trial and therefore reinstating the modified judgment. Lori filed another motion for new trial after the reinstatement, which the visiting judge who heard this case denied. Lori also requested findings of fact and conclusions of law.

On June 15, 2009, the visiting judge who heard this case signed the "Amended Findings of Fact and Conclusions of Law" as prepared by Howard's counsel. They provide in relevant part:

> 5. It is in the best interest of the children that LORI . . . and HOWARD . . . be appointed joint managing conservators of the children and that LORI . . . have the right to designate the children's primary residence.
>
> *Findings of Fact—Possession*
>
> 6. The periods of possession vary from the Standard Possession Order for the following reasons:
>
> > (a) the children are enrolled in school;
> >
> > (b) HOWARD['S] flexible work schedule enables him to provide the children the option to participate in extracurricular activities at their selection;
> >
> > (c) HOWARD . . . requested an extended visitation Order at the time of rendition of the original order;
> >
> > (d) LORI . . . failed to oppose the extended visitation Order with any evidence whatsoever at the hearing when HOWARD . . . requested an extended visitation Order at the time of rendition of the original extended visitation Order;
> >
> > (e) LORI . . . has engaged in a course of conduct during the pendency of the instant proceeding that has the effect of alienating the children from HOWARD . . . ;

(f)     HOWARD . . . has demonstrated during the pendency of this instant proceeding that he will foster the relationship between LORI . . . and the children during his periods of possession;

(g)     LORI . . . was given notice in open Court of the date and time of the hearing on possession, visitation, and access;

(h)     LORI . . . failed to appear at the hearing on possession, visitation, and otherwise offer any evidence;

(i)     HOWARD . . . appeared at the hearing on possession, visitation, and access and offered testimony supporting his request for an extended visitation Order;

(j)     The testimony offered by HOWARD . . . concerning possession, visitation, and access was credible and was not inconsistent with the current emotional, educational, and physical well-being of the children;

(k)     LORI . . . has misinformed the Court of the actual out-of-pocket expenses incurred for the insurance for the children during the pendency of this cause;

(l)     HOWARD . . . , based on the testimony presented, is a positive influence on the children's lives;

(m)     HOWARD['S] child support obligation as ordered was supported by evidence which was not contested by LORI . . . ;

(n)     LORI . . . interfered intentionally, on more than one occasion, with HOWARD['S] superior right to child custody during the pendency of the cause, resulting in further alienation of the children, necessitating a much broader visitation schedule for HOWARD . . . , as imposed by this Court.  Based on the evidence presented at trial and at hearings, the Court finds that the evidence was overwhelming that LORI . . . intentionally interfered with HOWARD['S] superior right to possession of the children during the pendency of this cause.  The evidence supporting this finding includes, without limitation, the testimony concerning LORI['S] attempt to withhold the children from

6

HOWARD . . . during a period of his superior right of possession on February 28, 2007, secreting the children on that day, removing the children from school on that day under false pretenses, wrongfully alleging to the teachers and this Court that she was instructed to do so by Child Protective Services. Subsequent testimony at trial by the CPS investigator, teachers, and admissions by counsel for LORI . . . confirmed L[ORI'S] statements were false and defamatory, despite the testimony of LORI . . . ;

(o)   LORI . . . additionally intentionally failed to abide by the possession and access Order entered by the Court after rendition necessitating a writ of attachment for the children;

(p)   LORI . . . made repeated allegations of physical and sexual abuse of herself and the children by HOWARD . . . at trial and during the pendency of this cause which were false based on the testimony presented at trial, including, but not limited to the lead CPS Investigator[']s findings that these allegations "Did Not Occur", and further evidenced by the Jury's verdict appointing HOWARD . . . as Joint Managing Conservator; and

(q)   HOWARD . . . and LORI . . . are not prohibited under the terms of the Final Decree of Divorce from exposing the children to any religious denomination provided such exposure does not physically, mentally, or emotionally endanger the children.

*Findings of Fact as Conclusions of Law*

7.   Any finding of fact that is a conclusion of law shall be deemed a conclusion of law.

. . . .

*Conclusions of Law—Conservatorship*

5.   LORI . . . and HOWARD . . . should be named joint managing conservators of the children with the rights and duties stated in the judgment, and LORI . . . should be named as the

7

conservator with the right to designate the children's primary residence.

*Conclusions of Law—Possession/Extended Possession Order*

6.     HOWARD . . . is entitled to periods of possession with [R.M.R.] and [R.D.R.] under the terms and conditions set forth in the order as the terms are in the best interest of the children. The standard possession order is not in the best interest of the children based on the following factors: (1) the age, developmental status, circumstances, needs, and best interest of the children; (2) the circumstances of the managing conservator and of the parent named possessory conservator; (3) the actions of LORI . . . during the pendency of this cause evidencing attempts to alienate the children from HOWARD . . . ; (4) LORI['S] failure to offer any evidence as to what periods of possession and access are in the best interest of the children; and (5) any other relevant factors.

7.     HOWARD . . . and LORI . . . are not prohibited under the terms of the Final Decree of Divorce from exposing the children to any religious denomination provided such exposure does not physically, mentally, or emotionally endanger the children. The Court expresses no opinion nor has it in the past preferred the religious views of either Respondent or Petitioner. The parties are free to choose to expose the children to any religious denomination and practices, if at all, provided such exposure does not physically, mentally, or emotionally endanger the children.

8.     The Modified Decree of Divorce signed on or about January 30, 2009, and the conditions contained therein are in the best interest of [R.M.R.] and [R.D.R].

Neither party complains of the voiding of the other visiting judge's findings of facts and conclusions of law or the agreed order voiding the civil district judge's granting of Lori's motion for new trial.

## II. Jurisdiction

Howard contends that this court lacks jurisdiction because Lori filed her notice of appeal late. Howard relies on the agreed order voiding the civil district judge's order granting the motion for new trial but cites no law in direct support of

8

his proposition. He makes no argument that the civil district judge's order was void independent of the agreement. We hold that Lori's notice of appeal was timely even though the civil district judge's order was voided by agreement.

On January 30, 2009, the visiting judge who heard this matter signed a modified divorce decree. Lori filed a timely motion for new trial on February 20, 2009.[4] On March 26, 2009, a civil district judge granted the motion for new trial. Under *Baylor Medical Center*, the trial court has power to "ungrant" a previously granted motion for new trial at any time until a new final judgment is signed, and the appellate deadlines run from the date of that new judgment.[5] On May 14, 2009, the parties entered into an agreed order signed by the visiting judge setting aside the March 26, 2009 order granting a motion for new trial; that is, the agreed order "ungranted" the new trial. Thus, the May 14, 2009 order reinstated the prior judgment of January 30, 2009.[6] The appellate deadlines began anew on the day of reinstatement, May 14.[7] On May 18, 2009, Lori filed a timely motion for new trial from the reinstated judgment.[8] The filing of a motion for a new trial extends the filing deadline of a notice of appeal to ninety days from the date of

---

[4]*See* Tex. R. Civ. P. 329b(a).

[5]*In re Baylor Med. Ctr. at Garland*, 280 S.W.3d 227, 230–31 (Tex. 2008).

[6]*See id.* at 230.

[7]*See id.* at 231.

[8]*See* Tex. R. Civ. P. 329b(a).

9

judgment,[9] or in this case, reinstatement of judgment.[10] Accordingly, Lori's notice of appeal, filed August 11, 2009, was timely filed.[11]

Howard appears to implicitly argue without support that the agreement voiding the civil district judge's order operated to void that order from its inception and somehow shortened the appellate timetable. But Howard makes no explicit argument that the civil district judge's order was void from inception, nor is there any basis for such an argument.[12] Further, the visiting judge signed the May 14, 2009 agreed order setting aside the civil district judge's March 26, 2009 order granting the motion for new trial on the 104th day after signing the modified decree, and therefore still within the visiting judge's plenary power held by virtue of the filing of the motion for new trial.[13] Accordingly, we reject Howard's contention that Lori filed her notice of appeal too late and hold that this court therefore does have jurisdiction to address Lori's issues.

---

[9]Tex. R. App. P. 26.1(a)(1).

[10]*See Baylor Med. Ctr.*, 280 S.W.3d at 231.

[11]*See* Tex. R. App. 26.1(a)(1).

[12]*See* Tex. Gov't Code Ann. §§ 24.169, 24.303, 24.601 (West 2004 & Supp. 2010); *Reiss v. Reiss,* 118 S.W.3d 439, 443 (Tex. 2003) ("In general, as long as the court entering a judgment has jurisdiction of the parties and the subject matter and does not act outside its capacity as a court, the judgment is not void."); *see, e.g., Hagen v. Hagen*, 282 S.W.3d 899, 902 (Tex. 2009) (noting that voidable judgment is not subject to collateral attack and must be appealed to be corrected).

[13]See Tex. R. Civ. P. 329b(e).

10

## III. Bench Hearing in Lori's Absence

In her first issue, Lori contends that the trial court abused its discretion by conducting the bench trial on possession, access, and child support in her absence and without notice to her after she received a favorable jury verdict the previous day. To clarify, we note that the issues of possession, access, and child support were not submitted to the jury and are issues reserved for resolution by the trial court.[14]

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.[15] An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances.[16] An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence and some evidence of substantive and probative character supports its decision.[17]

---

[14]*See* Tex. Fam. Code Ann. § 105.002(c)(2).

[15]*Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

[16]*E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

[17]*Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

Lori argues that she had no notice of the trial and that we should review the judgment as a postanswer default judgment. Her counsel, however, was present and participated in the bench trial. The judgment was therefore not a default judgment but a judgment on the merits.[18] Further, Lori's trial counsel did not object to the absence of notice until after she had completed her cross-examination of Howard; the objection was therefore untimely and did not preserve error.[19] Accordingly, we cannot say that the trial court abused its discretion by conducting the bench trial in Lori's absence. We overrule Lori's first issue.

## IV. Child Support

In her fourth issue, Lori contends that the trial court abused its discretion by setting child support based on an estimate of Howard's future earnings instead of leaving it at the temporary child support level of $1,500 per month. The trial court set child support at $843.25 per month. In the modified decree, the trial court stated the following findings and conclusions on child support:

> 1. the amount of child support ordered by the Court is in accordance with the percentage guidelines;
>
> 2. the amount of net resources available to Howard . . . per month is $3,373.00;
>
> 3. the amount of net resources available to Lori . . . per month is $2,600.00;

---

[18] *See LeBlanc v. LeBlanc*, 778 S.W.2d 865, 865 (Tex. 1989).

[19] *See* Tex. R. App. P. 33.1(a); *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g); *see also* Tex. R. Evid. 103(a)(1).

4.	the amount of child support payments per month that is computed if the percentage guidelines of section 154.129 of the Texas Family Code are applied to the first $7,500 of Howard['s] net resources is $843.25; and

5.	the percentage applied to the first $7,500 of Howard['s] net resources for child support by the actual order rendered by the Court is 25 percent.

A trial court has discretion to set child support within the guidelines established by the legislature.[20]  A trial court's child support determination will not be reversed absent an abuse of discretion.[21]

Section 154.062 of the family code provides,

(a) The court shall calculate net resources for the purpose of determining child support liability as provided by this section.

(b) Resources include:

(1) 100 percent of all wage and salary income and other compensation for personal services (including commissions, overtime pay, tips, and bonuses);

(2) interest, dividends, and royalty income;

(3) self-employment income;

(4) net rental income (defined as rent after deducting operating expenses and mortgage payments, but not including noncash items such as depreciation); and

(5) all other income actually being received, including severance pay, retirement benefits, pensions, trust income, annuities, capital gains, social security benefits other than supplemental security income, unemployment benefits, disability and workers' compensation benefits, interest income

---

[20]*Rodriguez v. Rodriguez*, 860 S.W.2d 414, 415 (Tex. 1993).

[21]*Id.*

13

from notes regardless of the source, gifts and prizes, spousal maintenance, and alimony.

(c) Resources do not include:

(1) return of principal or capital [or]

(2) accounts receivable . . . .

(d) The court shall deduct the following items from resources to determine the net resources available for child support:

(1) social security taxes;

(2) federal income tax based on the tax rate for a single person claiming one personal exemption and the standard deduction;

(3) state income tax;

(4) union dues; and

(5) expenses for the cost of health insurance or cash medical support for the obligor's child ordered by the court under Section 154.182.

(e) In calculating the amount of the deduction for health care coverage for a child under Subsection (d)(5), if the obligor has other minor dependents covered under the same health insurance plan, the court shall divide the total cost to the obligor for the insurance by the total number of minor dependents, including the child, covered under the plan.[22]

Lori argues that no evidence received during the bench trial reflected a change in Howard's circumstances or financial condition since the time temporary child support was set. She also argues that the trial court violated section 154.062 of the family code in lowering child support based on past

_____

[22]Tex. Fam. Code Ann. § 154.062 (West Supp. 2010).

14

income tax records of his corporation.  Finally, she argues that the amount of child support falls below the statutory guidelines.

Lori has not brought any portion of the record demonstrating how the trial court arrived at the temporary child support amount of $1,500 per month. Howard was the sole witness at the final bench trial.  Howard, a lawyer, testified that he primarily represents plaintiffs and that his income is typically derived from contingency fees.  In response to his counsel's question seeking an estimate of Howard's earnings for 2008, the year of the trial, Howard responded, "I'm just starting to pick back up from '07 and my best calculations are maybe this year 40 to 50,000.  That's pretty much what I'm getting back up to, and that's where we're at right now in October."  Howard answered in the affirmative questions indicating that his tax return for 2007 was already before the court (although Lori did not bring such record to this court), that it was a bad year, and that he'd only earned about $11,000 in 2007 and had been forced "to margin" about $80,000 from his stock and bond accounts to live on that year.  He also testified that his "income [was] starting to pick back up" and that "we're looking about 40 to 50,000 this year.  It was higher before and then it tanked and then it's starting to pick back up."  He further stated that if he "had to guess, [he] would say that [his income] would go up higher next year [2009]."  Although Lori's counsel cross-examined Howard, she did not ask him questions pertaining to child support other than medical support, which is not at issue here.  The trial court stated at the close of

15

the bench trial that it would base child support on Howard's anticipated income of $50,000.

Using the Office of the Attorney General's 2009 Tax Charts, the trial court's finding in the January 30, 2009 modified divorce decree that Howard's net monthly resources are $3,373 indicates that the trial court placed Howard's annual gross income at around $51,000.[23] Given Howard's testimony and the absence from the appellate record of any other pertinent evidence before the trial court, we cannot conclude that the trial court abused its discretion by basing child support on that figure or that the monthly child support of $843.25 is below the statutory guidelines. We overrule Lori's fourth issue.

## V. Possession

In her third issue, Lori contends that the trial court abused its discretion by awarding Howard holiday possession based upon his Jewish religion, violating the Establishment Clause of the First Amendment to the United States Constitution as applied to the States through the Fourteenth Amendment. On direct examination by his counsel at the bench trial, Howard testified,

Q.    . . . [Y]ou are requesting after the jury's verdict extended visitation, correct?

A.    That's correct.

Q.    Okay. And what are you requesting from the Court?

---

[23]*See* Tex. Fam. Code Ann. § 154.061(b) (West 2008); Office of the Attorney General, 2009 Tax Charts, available at http://www.oag.state.tx.us/cs/taxcharts/2009taxchart.pdf (last visited August 10, 2011).

16

A.    I am requesting that every other week like first, third and fifth weekends would be from pick up from school on Wednesday to drop off to school on Monday mornings.

. . . .

Q.    And her—her karate classes are on what day of the week?

A.    Her karate class would be on—her pretest would be on Thursdays.

Q.    Okay.  And you would take her to her pretest on Thursday, then her belt test on Friday?

A.    That's correct.  Right.  Both [R.M.R.] and [R.D.R.] used to do that.  That's correct.

Q.    And—

A.    And Wednesdays were—are their midweek Hebrew classes.

Q.    Yeah.  Wednesdays are important in a religious sense because of why?

A.    Well, that's the only way they could prepare for their bar and bas mitzvah.  Ten years that they need to train for their bar and bas mitzvahs starts—the midweek Hebrew classes start in third grade.

Q.    And during the weeks that you do not have possession under any possession order entered by this Court, what are you asking this Court to do concerning Sundays?

A.    Sundays, I just want—I would like to have visitation.  I would need to pick them up at 8:30 and drop them back off at Lori's at 1:00 o'clock.

Q.    And—and what would the purpose of that pick up and drop off be on those Sundays?

A.    So that [R.M.R.] and [R.D.R.] do not miss 50 percent of their Sunday school teachings at the synagogue for their bar and bas mitzvahs.  They've been missing 50 percent of them for three and a half years.

17

Q. And as far as—[R.M.R.]'s bar mitzvah is coming up in January, correct?

A. That's correct.

Q. Okay. And what is that—what date is that scheduled for?

A. The Saturday the 20—January 24th.

Q. Okay. So you are asking this Court to grant you some—a period of time of exclusive possession surrounding that bar mitzvah?

A. Yes. I—I have some days with them under the regular schedule, but I'm asking for some extra days so that it would end up being: I'd have him for one week before his bar mitzvah and one week after so that—that he would be prepared for his bar mitzvah and there would be no—no disturbance or interruptions. I'd get him ready. And then we can go do something for him after his bar mitzvah.

Q. Okay. So that period is from January 19th to January 27th, correct?

A. Yes. I be—that's correct. I think it's an eight-day period I'm asking for there because the other days I already have.

Q. That surrounding his bar mitzvah so you can prepare and then celebrate afterwards?

A. Yes. He deserves it.

Q. And you would want [R.D.R.] with you also during that time period?

A. Absolutely. It wouldn't be the same without them together. They've always done everything—they go to mid-Hebrew together. They study together. Yes.

. . . .

Q. Now, let's talk about the—you were granted by the jury exclusive right to the religious decisions concerning the children?

18

A. Yes, sir.

Q. Okay. And—

[HOWARD'S COUNSEL]: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. . . . I'll show you what I marked as Respondent's Exhibit 1. Do you recognize that document?

A. Yes. These are—these are Additional Temporary Orders, yes.

. . . .

Q. Okay. And they've since then been altered and/or amended, correct?

A. Correct.

. . . .

(Respondent's Exhibit No. 1 was admitted.)

. . . .

Q. Okay. And in that order it addresses approximately 12 Jewish holidays, correct?

A. Yes. Twelve Jewish holidays, correct.

Q. Twelve of the 30-something Jewish holidays, correct?

A. Yeah. Yeah, there's a lot of holidays.

Q. Right.

A. We picked only the major ones that we as a family celebrate.

Q. Okay. So the holidays addressed in that order were holidays that [the children] grew up celebrating on a regular basis?

A. Yes. Those are the 12, yes.

Q. Okay. And—and—and when I say "celebrate the holidays," it's not simply a prayer at dinner—

19

A.    No.

Q.    —there are actual activities involved?

A.    Oh, yes.  Yes.  For example, like the Shavuot holiday, which is the giving of the torah.  We used to have all the kids come spend the night at our house and do grab bags.  They would— we would do bible questions, bible study.  And if the kids got the questions right, they get the girl grab bag or the boy grab bag.  And whoever stood up the longest, they answered the questions, won.

So these holidays aren't just go to services, say prayers, go home.  We lived these holidays.  That's the difference.  You know, it wasn't just a reform Jewish existence like you're—you've seen in the standard court schedule that Jeff Kaiser actually wrote the court's schedule for the Jewish holidays.  And—and I talked to him about that.  And he says he even forgot to even put in Shavuot, which is one of the big ones.  But these are the real ones that we as a family celebrated.

Q.    Okay.  And did Lori ever protest or contest the celebration of these holidays on a regular basis while y'all still lived together as a married couple?

A.    For many years she just—she wouldn't get involved in a lot of those holidays.  You know, I was the one in charge of all the kids when they came, you know, and she wouldn't do the Shavuot thing with us.  She'd go off to another room.  She wouldn't participate.  I couldn't get her to participate.

Or going and lighting the candle ceremonies on Hanukkah, that was—the kids and I were going to the lightings, Hanukkah ceremony candles every eight nights and reading the eight-night stories.  Every night, we'd read, in Hanukkah, the eight-night stories.  Well, I would read them to the kids.  She would have little or no part of any of that.

Q.    Okay.  For example, one of the most recent holidays was Sukkot, correct?

A.    Oh, yeah.  We just had seven days of Sukkot.

Q.    Seven days of Sukkot.  And what is the traditional celebration for Sukkot?

20

A.    You—you build a wooden structure in the back of your house to celebrate the fes—

Q.    It's called a—

. . . .

A.    Sukkah is the building.

Q.    Okay.  Okay.

A.    It's called Festival of Booths.  It's a booth.  And you eat dinner in there and you—you're celebrating the first feast.  It's like the Jewish Thanksgiving.  That's what I call it because it's the first harvest.

Q.    Okay.

A.    Celebrates the first harvest.

Q.    So [Lori] this year had possession of the children—

A.    Yeah.

Q.    —during Sukkot?

A.    Yes.

Q.    Pursuant to this flip-flop order every other year that she would get Sukkot, correct?

A.    Correct.

Q.    And to your knowledge, did they celebrate Sukkot—

A.    They didn't.

Q.    —in any way?

A.    They didn't celebrate Sukkot.  They didn't celebrate Rosh Hashanah.  They didn't celebrate Simchat Torah.  They all ran in a row.  They didn't—they didn't celebrate anything.  I'm the one—when I had them on Yom Kippur, took them to Yom Kipp[u]r services and we had everybody come over to the house from the synagogue.  But they did not—they did not celebrate a single holiday when the four of them ran in a row.

21

Q. Okay. And—and in your opinion, is it important to the emotional well-being and the religious education of the children that they actually participate in these 12 holidays that you're asking the Court to award you visitation during?

A. Yes. It's extremely important. In fact, one of the best examples I can give you is the Rosh Hashanah example. Rosh Hashanah is one of the holiest Jewish holidays that there is that we have always—none—none of the Jewish children go to school on Rosh Hashanah. You're not supposed to go to school. It's prohibited. She sent them both to school. They're not supposed to be in school.

And when it came to Yom Kippur, the holiest day on Yom Kippur, these are the ten days of—Rosh Hashanah is two days and Yom Kippur is one day, but it's ten days in between. They're not supposed to go to school on Rosh Hashanah. They're not supposed to go to school on Yom Kippur. Those are the only two days of the whole year that they're not supposed to go to school. They didn't go to school when they were with me on Yom Kippur. We were in services. And then we celebrate a break—fast at night. But they were in—and I sent a letter to the school for Yom Kippur excusing them because religious holidays are not considered absences.

. . . .

Q. The public schools actually excuse these absences for these Jewish holidays?

A. Right. It doesn't go against their record at all as an absence. It's not considered an absence when it's a religious holiday, but they were sent to school on Rosh Hashanah. And none of the kids were—I made sure none of the kids went to school on Rosh Hashanah in all the years that we were together.

But now that she had them, you know—well, I got that e-mail from her, [w]ell, I have the kids on Rosh Hashanah from X minute to Y minute and not one of those times did she let those kids celebrate Rosh Hashanah.

Q. Now, there are—there are a few extra days here on these Jewish holidays. If there comes a time where, you know, [the children] say, Hey, we want to go see our mommy today, are you going to have a problem with that?

22

A. I've taken them to her. I have no problem if the kids say, Hey, can we go early to Mom's? I got half a dozen e-mails saying can the—tell—asking Lori, Can the kids come over to you early? They want to go see a movie with you or they want to have dinner with you or they want to do something with you. I said, Can I bring them early? They want to do it. I don't—the difference is I don't use the kids as a sword to get at her.

Q. Okay.

A. If the kids want to go see her—

Q. We've—we've been through all that. We're just—we need to stay focused on what you want by way of visitation.

A. Sorry. Sorry.

Q. Summarize for the Judge. You're asking—you're asking for the periods that you do not have your extended visitation on Sundays from 8:30 to 1:00 o'clock, correct?

A. 8:30 to 1:00, yes.

Q. And then Wednesdays?

A. Yes.

Q. You pick them up at school and take them back—back to school on Thursday morning for the periods that are not—

A. The second and fourth weekends, yes.

Q. —periods that are not in—when you have them in your possession?

A. Right.

Q. And for the first, third and fifth weeks, you're asking to pick the children up on Wednesday from school?

A. Yes.

Q. And take them to school Monday morning?

A. Every other week, yes.

Q. So that on Wednesdays you can take the children to their Hebrew lessons?

A. Yes.

. . . .

Q. Okay. And then you're asking for the—the holidays, not flip-flop back and forth because . . .

A. She does not celebrate the Jewish holidays.

Q. Okay. So you would like those 12 Jewish holidays as outlined in that previous order?

A. Yes.

Q. And you're also asking for just—just for this year, January 19th through the 27th, to help [R.M.R.] prepare for and celebrate his bar mitzvah?

A. Yes, sir. Yes. That's—that'll be the culmination of his ten years of studying.

On cross-examination, Howard testified as follows:

Q. And you are—are not willing, as I understand it, to exchange days with [Lori]. If—if the Jewish holidays fall during her periods of possession, you're not willing to exchange those days; is that correct?

A. I'm not willing to exchange those days? No. I—I—she doesn't celebrate the Jewish holidays.

Q. You're not willing to give her additional days, not the Jewish holidays, but additional days for possession and access if the Jewish holidays occurred during her periods of possession?

A. No, ma'am. I've lost so much time with my kids. I need a lot of make-up time with these kids.

Q. Okay. And, for instance, if the Court orders the Jewish schedule that you're requesting during time periods, three weeks could go by and [Lori] won't have access to her children; is that correct?

24

A. Ma'am, it's almost been three weeks and I haven't seen [the children].

Q. That's correct. And that was you who came to court and wanted that Jewish holiday schedule, is it not?

A. Yes. I wanted the Jewish holiday schedule. Not to exchange with her on Jewish holidays that she doesn't celebrate. She uses them to just keep them from me and that's why [I] haven't seen them in over three weeks.

In the original decree, the visiting judge hearing this case awarded Howard superior, exclusive possession of the children for twelve Jewish holidays and also awarded him possession of the children

- every first, third, and fifth week for a period beginning at school's dismissal on Wednesdays (or 3:00 p.m. if school is not in session) and ending when the first school day after the weekend, Monday except in cases of school holiday, resumes (or 9:00 a.m. on Monday if school is not in session);

- every remaining Wednesday after school ends until school resumes Thursday (or every Wednesday at 3:00 p.m. until Thursday at 3:00 p.m. if school is not in session); and

- every remaining Sunday from 8:30 a.m. until 1:30 p.m.,

except during Lori's limited summer period of possession. That original version also repeatedly awarded Howard the exclusive right at all times to choose the children's religion; at the same time it awarded Lori the exclusive right to choose the children's religion during her period of possession as well as the right to direct the moral and religious training of the children during her period of possession. In her motion for new trial, Lori challenged (1) Question No. 3 of the jury charge on Establishment Clause grounds, citing *Larson v. Valente*[24] and *In*

---

[24]456 U.S. 228, 244, 102 S. Ct. 1673, 1683 (1982).

25

*re Knighton;*[25] (2) the trial court's conducting the bench trial in her absence; (3) the disproportionate awards of periods of possession, again relying in part on the Establishment Clause to complain that the award of extra possession time to Howard "block[ed her] almost entirely from being able to provide her children with any religious instruction in her religious faith" and (4) child support.

At the hearing on Lori's motion for new trial, the visiting judge agreed that submitting Question No. 3, asking which parent should have the exclusive choice of the children's religion, was improper. He indicated that he had given Howard "a significant number of additional holidays" based on the jury's answer to the improper question and that he would strike that part of the decree that was based on the jury's answer.

The visiting judge denied Lori's motion for new trial but modified the decree on his own motion on January 30, 2009. The modified decree gives each parent the right to direct the religious and moral training of the children during each parent's respective period of possession. But the modified decree also awards Howard possession of the children every Wednesday afternoon and evening and every Sunday morning from 8:30 a.m. to 1:30 p.m. (except for Lori's holiday possession and limited period of summer possession) and on a majority of Sunday afternoons and nights. In addition, the decree awards Howard possession of both children on their bar and bat mitzvahs and for several days preceding and following those dates. Further, while the modified decree reduces

---

[25]723 S.W.2d 274, 277–78 (Tex. App.—Amarillo 1987, no writ).

Jewish holiday time awarded Howard from twelve to four holidays and awards Lori every Thanksgiving, Christmas, New Year's Day, and Easter holidays, the modified decree also provides,

> 3.  *Provisions for Jewish Religious Holidays*
>
> ***To the extent Jewish Religious Holidays conflict in any manner with other holidays or possession orders addressed herein, the following Jewish Religious Holiday possession order prevails.*** In addition to all other provisions for possession provided in this decree, IT IS ORDERED that Howard . . . shall have the following **exclusive periods of possession on Jewish Religious Holidays**:
>
> *Rosh Hashanah*—In all years for a period beginning at sunset the day prior to Rosh Hashanah and ending on the day after Rosh Hashanah.
>
> *Yom Kippur*—In all years for a period beginning at sunset the day prior to Yom Kippur and ending on the day after Yom Kippur.
>
> *Hanukkah*—In all years for a period beginning at sunset the day prior to Hanukkah holiday and ending on the day after Hanukkah.
>
> *Passover*—In all years for a period beginning at sunset the day prior to the holiday and ending on the day after Passover. [Emphasis added.]

Some observances of Jewish holidays last days. It is unclear from the decree whether Howard gets possession of the children for two nights and two days for each Jewish holiday or for the length of the observance for each holiday plus the day after the observance ends, and we do not need to sort that out here, except to note that Christmas and Hanukkah celebrations often overlap, as do

27

the celebrations of Passover and Easter.[26] We note that in any event, in year 2016, when R.D.R. is still a minor, Hanukkah begins the evening of December 24.[27] Under the divorce decree, which provides that Jewish holidays prevail over all other periods of possession, Lori would lose her Christmas possession of R.D.R., as well as her New Year's Day possession if the decree were intended to give Howard possession for the entire eight days of Hanukkah.[28]

As the Supreme Court of the United States has provided, "The touchstone for our analysis is the principle that the First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."[29] As our sister court in Amarillo has explained, the Establishment Clause, made applicable to the states by the Fourteenth Amendment,[30]

> mandate[s] a zealous protection of an individual's untrammeled right to religious belief so long as the teachings and practice of that religious belief are neither illegal or immoral. Accordingly, the courts of this state would have no more power to, directly or indirectly, attempt to effectuate by decree a conformance to, or condemnation of, certain religious teachings or practices, than would the

---

[26]See Tex. R. Evid 201(b); see, e.g., Tracey Rich, A Gentile's Guide to the Jewish Holidays, Judaism 101, http://www.jewfaq.org/holidayg.htm (last visited August 10, 2011); id. Jewish Holidays, Judaism101, http://www.jewfaq.org/holiday0.htm (last visited August 10, 2011).

[27]See Colel Chabad Interactive Calendar, http://www.colelchabad.org/calendar.bp?gdate=12/1/2016 (last visited August 10, 2011).

[28]See id.

[29]McCreary County, Ky. v. Am. Civil Liberties Union of Ky., 545 U.S. 844, 860, 125 S. Ct. 2722, 2733 (2005) (quotation marks omitted).

[30]Cantwell v. Connecticut, 310 U.S. 296, 302, 60 S. Ct. 900, 902 (1940).

Legislature or the Congress have the power to establish a state religion by law. As relevant here, that means that one's religious beliefs, teachings, and practices, per se, are not grounds for depriving a parent of his or her children unless the teachings and practice of such beliefs are illegal or immoral. Thus, it is beyond the power of a court, in awarding the custody of a child or children[,] to prefer the religious views or teachings of either parent, even though the beliefs and practices of one parent might be more "normal" or more in accord with majority religious views or practices. Therefore, as this Court earlier stated in the first appeal of this case, it is a fundamental principle that the State cannot prefer the religious views of one parent over the other in deciding the best interest of a child.[31]

We do not know Lori's religious preference, if any. Howard testified that she did not participate in the Jewish celebrations. Howard's counsel stated at the hearing on her motion for new trial, "And my recollection of the—of the trial testimony was that I'm really not sure what religion she prefers. If she's going to remain Jewish or become Methodist, I don't know. . . . I think the time to give that testimony would have been at the hearing on visitation and . . . access." Lori's latest motion for new trial, filed after the modified judgment was reinstated, indicates that giving Howard possession every Sunday "completely precludes [her] having any opportunity to provide her children with religious instruction on Sunday, which is her primary day for attending her church." No evidence at the trial on access and possession indicated that Lori's beliefs about religion, whatever they are, are "illegal or immoral."

As Lori notes in her statement of facts in her brief, the decree provides Howard with additional possession of the children for religious instruction in his

---

[31]*Knighton*, 723 S.W.2d at 277–78 (citations omitted).

faith while blocking her almost completely from being able to provide her children with any religious instruction. Howard argues that Lori requested that he receive extended possession and the "four Jewish holidays" at trial, yet he does not present the whole story. Lori indicated at trial that she was willing for Howard to have the four Jewish holidays as well as Wednesday nights, but not every Sunday morning. She further sought additional periods of possession of the children in exchange for his Jewish holiday possession. As the decree now stands, absent her limited summer possession, Lori has Easter and Christmas possession, but otherwise no Sunday mornings, no Wednesday nights, and less than fifty percent of Sunday afternoons and nights, and all her periods of possession are subject to Howard's superior right of possession during four Jewish holidays, the extent of which is not made clear in the decree. Given the total absence of evidence that Lori's religious preferences or preferences for no religion are illegal or immoral or otherwise present a danger to the children, we hold that the possession order violates Lori's rights under the Establishment Clause. We sustain her third issue. Because of our resolution of this point, we do not reach her second issue.[32]

## VI. Conclusion

Having held that we have jurisdiction over this appeal and that the trial court did not abuse its discretion in conducting a bench trial in Lori's absence or in setting child support, we affirm the trial court's judgment as to child support as

---

[32]*See* Tex. R. App. P. 47.1.

well as to all unchallenged portions of the decree, including but not limited to the divorce, the property division, conservatorship, and medical support.  But having held that the possession order violates Lori's rights under the Establishment Clause, we reverse the trial court's judgment as to the possession order and remand this case for a new trial solely on the issue of the possession of the children.[33]

LEE ANN DAUPHINOT<br>
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED:  August 11, 2011

---

[33]*See* Tex. R. App. P. 44.1(b); *In re L.S.C.,* 169 S.W.3d 758, 764 (Tex. App.—Dallas 2005, no pet.).